[No. S004466. Crim. No. 22808. Feb. 28, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
BRETT PATRICK PENSINGER, Defendant and Appellant.

[No. S009489. Crim. No. 24569. Feb. 28, 1991.]

In re BRETT PATRICK PENSINGER on Habeas Corpus.

**COUNSEL**

Marvin F. Friedman and Louis M. Natali, under appointments by the Supreme Court, and Juliana Marciel for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Harley D. Mayfield, Assistant Attorney General, Steven H. Zeigen, Jay M. Bloom, Frederick R. Millar, Jr., and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROUSSARD, J.**—Defendant Brett Patrick Pensinger was convicted of the first degree murder of Michelle Melander, and the jury found true special circumstance allegations that the murder was committed in the course of a kidnapping and that the murder was intentional and involved the infliction of torture. The jury found not true allegations that the murder was committed during the commission of a lewd act on a child under the age of 14 and that the murder was committed in the course of an oral copulation in violation of Penal Code section 288a. Defendant was also convicted of kidnapping Michelle Melander and Michael Melander, Jr. He was acquitted of committing a lewd act, or oral copulation in violation of Penal Code section 288a, on Michelle Melander. The jury fixed the penalty at death, and this appeal is automatic.

We affirm defendant's convictions and affirm the special circumstance finding as to the allegation of a murder in the course of a kidnapping. We reverse the torture-murder special-circumstance finding, but affirm the penalty determination.

### I. SUMMARY OF FACTS

On July 31, 1981, defendant left his Orange County, California home and went on an errand in his uncle Thomas Meyer's pickup truck from which

he never returned. On August 4, 1981, defendant turned up in Parker, Arizona. He went to the Silver Saddle bar in midafternoon, and met Vickie and Michael Melander, who had been there drinking since noon. Defendant introduced himself as Panama Red, and said his real name was Don Donovan. He drank and played pool with the Melanders. At about 7 p.m., Vickie said she had to go check on her children who were staying with a friend. Defendant drove her to the Williams home, and Vickie introduced defendant as Panama. Defendant and Vickie put Michael, Jr., five, and Michelle, five months, into the truck with them and drove off, around 7:40 p.m. They drove about 10 minutes, then stopped at the Turtle Barn bar in Parker. Vickie and defendant went in for a beer, leaving the children unattended in the truck. While they were inside, Michael, Jr., found defendant's rifle and pointed it at a man in the Turtle Barn parking lot, who confiscated it. When Vickie came out to check on the children, Michael, Jr., told her that a man had stolen Panama's gun. She told defendant, and she said he became enraged, so much so that she became afraid of him and ran off down the street. Vickie said that defendant drove after her and persuaded her to get back in the truck. They went to the Silver Saddle, where Vickie again left the children unattended in the truck, and reported to her husband that defendant and she were going to the sheriff's substation to report the theft of the gun. Defendant apparently had a beer while the Melanders talked. Some witnesses said the Melanders argued; none reported that defendant acted violent or angry.

Vickie and defendant, still with the children in the truck, arrived at the sheriff's substation about 8:20 p.m. Vickie went into the station, expecting defendant to follow. She reported the theft; the sheriffs said it was a local police matter, and called the Parker police for her. She looked out and noticed that the truck was gone, but was not concerned, assuming that defendant was either looking for his gun or was back at the Silver Saddle. When the local police arrived, she reported that her own gun had been stolen; then, when she was unable to describe the weapon, she admitted that it was actually someone else's gun. The police drove her back to the Silver Saddle about 9 o'clock. When she realized that her children were still unaccounted for, she became concerned.

A customer and an employee of the PDQ market in Parker testified that a tall young man in a cowboy hat came into the store sometime after 8 o'clock on August 4, looking for someone who had stolen a rifle out of his truck when his wife and five-year-old child were in it. He was beside himself with rage, and said that if the person who stole the gun came in and tried to use it in a robbery of the store, they had his permission to grab the gun and "blow their head off." The store employee saw the man get into a light blue pickup and drive off. The employee saw no one else in the truck.

Michael, Jr., confirmed that the man he knew as Panama came with his mother to pick him and his sister up at the Williams house, that they all drove off in the man's light blue pickup, that they stopped at the Turtle Barn, that his mother and Panama went in, that he pointed Panama's rifle at a man in the parking lot, that the man took the gun, that when his mother told Panama this, Panama "hit the wall" and his mother ran off, that Panama got his mother to get back in the truck, and that they went to the sheriff's substation where his mother went in. Michael, Jr., said that Panama drove off, and when they got near the Parker Dam, Panama said that there was a cop following him and that Michael, Jr., should get out and wait until Panama came back for him. The boy did. After a while he started to hitchhike. He did not recall stopping at the PDQ market, and he did not see Panama hit his sister in the truck. He misidentified a photo of another man as Panama, was unable to identify defendant, but did identify a picture of defendant's truck. He said Panama did not hit him, and that Michelle was crying as Panama drove off. He was certain that it was the same man who picked him up at the Williams home, who drove off with him and his sister and left him by Parker Dam.

A couple picked Michael, Jr., up about 9:30 p.m. near the Parker Dam, on the California side of the dam. He did not seem upset, but said that a man whose name he did not know had his little sister and had driven off with her in his pickup. They called the sheriff, and waited in a restaurant. When the sheriff came in, the couple said the boy's first words were, "Where's Panama?" Michael, Jr., told the sheriff that Panama had taken him and Michelle from in front of the substation, that Panama had taken him to his trailer and that Panama then had dropped him off on the road, telling him to wait.

Michelle's body was discovered six days later on August 10, 1981, in the Black Meadows Landing dump in California, some nine miles from where Michael, Jr., was found. The body had many injuries, including a crushing injury to the skull which definitely occurred before death. Depending on the type of brain injury suffered, the child could have lived from two to twenty minutes, but no more.

There was also a bruise above and to the left of the left eye, caused by pressure from a smooth surface, which occurred while there was good circulation of blood. The collarbone was fractured in two places, and three front left ribs were broken and pressed in so that they seriously jeopardized breathing and probably punctured the lungs. A single crushing blow probably caused these injuries, and they happened when the child was alive and had good circulation, before she went into shock. The pathologist had no basis for determining whether the head or the rib injuries came first. Associ-

ated with the rib injury was a bruise involving scraping and tearing of the skin from the left nipple to the left armpit; this also occurred before death.

The left upper arm was fractured near the elbow and nearby there was a bruise. These injuries could have been caused by impact from a blunt object, or by holding the child by the arm and twisting the arm while flinging the body down. They happened before death and before the child went into shock. In addition, there were many small, irregular scrapes, bruises and tearing of the skin along the left outer forearm, inflicted while there was good circulation and blood pressure, before shock. There was also a large bruise on the left thigh which occurred before death.

These were the injuries which occurred before death. There was considerable further injury which may or may not have occurred after death. Seven right back ribs and six back left ribs were broken and pressed in. This injury happened at one blow. There was a long incision from the ribs to the groin on a slightly leftward diagonal. It appeared that the uterus had been removed through this opening. There were two small incisions over the left groin. There was an oval incision between the legs; the vagina and anus had been removed. It was impossible to determine conclusively whether there had been any sexual assault.

Defendant was arrested in Midland, Texas, in mid-August. He had his uncle's truck; it was dirty, dented, and stripped of valuables. In it were a box of blades for a utility knife and a crumpled cowboy hat. There was blood on the front fender, but it could not be determined whether this was human or animal blood. The fabric and seat covers in the truck were examined, and there was no sign of blood or hair on them. Defendant had bloodstains on his pants, shirt, belt and boots when arrested, but they were not typed or compared to his or the victim's blood.

Defendant was extradited from Texas to Oregon, where he was housed in a Washington County jail with one Tony Krossman, who had been a paid informant for the Federal Bureau of Investigation, the Drug Enforcement Administration, and various sheriffs' departments. Krossman was under sentence for grand theft, with a five-year probation on conditions that he serve a year in jail and that he not act as an informant without the knowledge of the sentencing judge. Krossman testified that defendant told him that he was trying to make bail because he was afraid that warrants would arrive from Arizona and California charging him with kidnapping and murder. Krossman said that defendant told him he had killed someone. The only details Krossman could remember were that defendant said that the crime had happened in Parker or Flagstaff, Arizona, and that the defendant was afraid that a blonde woman had seen him in the course of the crime.

When detectives from San Bernardino County interviewed Krossman in the Oregon jail, he initially denied that defendant had said anything to him. He later explained to Oregon officials that his probation condition prevented his cooperation; when the Oregon officials cleared his cooperation with his sentencing judge, he gave the incriminating statements. Krossman had been released from jail at the time of his testimony, and he had received and expected no benefits for it.

Two San Bernardino jailhouse informants gave much more detailed statements.

Gary Howard[1] was in an isolation unit in a cell adjoining defendant's in September 1981. He said that he had no access to television, radio or newspapers in the unit, and had heard nothing about defendant's case. Defendant, in their first conversation, told Howard that he was charged with a kidnap murder involving a child. A couple of days later, defendant said that he had trouble sleeping because of his case and needed to talk. He said he had picked up a baby in Arizona and killed her. A few days later, defendant told Howard that he had been going through Arizona and stopped at a bar, where he drank and shot pool with the Melanders. He got friendly with Mrs. Melander, and when he told her he was on his way to Texas but was broke, she said that if he would drive her out to pick up her children, she would give him money for gas. They went and picked up the children, and then went into another bar. Little Michael, Jr., came in and said someone had stolen a gun out of the glove compartment of defendant's truck. Defendant got upset, and Mrs. Melander suggested going to the police. They went to a sheriff's substation, but defendant decided not to enter it because he remembered that the truck he was in was stolen. He drove off because he was fearful of being discovered with the stolen truck. He drove around not knowing what to do. He had been drinking and shooting Quaalude. He drove out of town, and when the little girl started crying, he slapped her hard enough to break her ribs, but she did not stop crying. He then threw her around in the truck, and she did stop crying. In one conversation he said that when he stopped to relieve himself, Michael ran off. In another conversation defendant said that Michael was still in the car when he stopped and tried to force the baby to orally copulate him. When he could not do this, he cut her belly and cut her private parts out. He then drove to a dump and put her in a plastic bag and threw her out. He said he cut the baby with a hunting knife and left her body near Parker Dam. In another conversation defendant said that he had a companion named Paul who slapped the baby around in the truck, then threw her out at the dump and cut her. He later admitted that there had been no accom-

---

[1] See *People* v. *Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279].

plice. Defendant also said that he was going to "play a dummy act" to get to Patton State Hospital, and claim he had a split personality and had blacked out. At one point during one of their conversations, defendant said that he kept slashing and sticking the baby, that she kept screaming and yelling, that she looked like hamburger and that he was cutting her with the knife to stop her from crying. In another conversation he said that he had removed the sex organs to obscure the sexual assault and to make it difficult to identify the baby's sex.

Howard denied that he got any of this information from the press or in the jail. He denied that he received any benefit for his testimony, though it is true that two of the investigating officers and the district attorney in this case testified for him at his penalty trial, which occurred before defendant's trial. He said that he was testifying because he had a little girl and did not like baby murderers. He admitted making a false accusation against someone in a drug offense in the hopes of getting help in his child custody dispute.

David Hicks, who was in custody pending sentencing on a robbery conviction, and who was still facing trial in a kidnap robbery, testified that in October 1981, defendant found that Hicks was housed with Howard, and told Hicks that he would give him $500 to kill Howard to prevent Howard's testimony against him. Hicks had no intention of killing Howard. In December, when they were housed together, defendant asked Hicks why he had not killed Howard. Hicks at first said he had no reason to do it, then said if defendant's father would give him $500, he would do it. Defendant then told him about the charged offenses. He said that he had stolen his uncle's truck and had gone to Oregon to see his girlfriend Molly. He found she had another boyfriend, so he slashed the tires and broke the windows on the boyfriend's car and went to Parker, Arizona. He said he was drinking with the Melanders, and that Vickie said that she would give him gas money if he gave her a ride to pick up her children. They picked up the children and stopped at a bar. The boy, Michael, came into the bar and said that a gun had been stolen from the truck. Defendant suspected Michael Melander, Sr. They went to the police station to report the theft, and Vickie went into the station. Defendant drove off because he was frightened about being in the stolen truck and feared he had warrants outstanding from Oregon. He stopped in the desert to urinate and the boy ran off. He drove to a junkyard. He "did in" the baby girl. He tried to have sex with her but she was too small so he cut her. He put her in a plastic bag and threw her body in the junkyard. He went to the dam and buried the knife. He said he had not thrown the knife into the dam, as he had told Howard. Hicks told defendant he should have his father go and recover the knife, but defendant said that this was not possible because he had told his father he was inno-

cent. Hicks offered to have the job done, and defendant told him where he had hidden the knife.

Hicks denied getting any benefits for his testimony and denied that he had gotten any of the details of the offense from Howard or anywhere but from defendant. He admitted putting on a false insanity defense at his trial. He did not tell the authorities about defendant's statements until just before his own sentencing, in January 1982. He was testifying out of a sense of public duty. He told officers about the location defendant said he had put the knife; the officers did recover the utility knife handle from that location.

The investigating officers in the case confirmed that they had offered Howard and Hicks no benefits for their testimony. They also confirmed that the isolation units in which defendant, Hicks and Howard were housed generally had no access to radio, television or newspapers, but confirmed that Howard could have had access to newspapers during a period in August 1981.

The defense case consisted of attacks on the credibility of Howard, and defendant's testimony that he had not kidnapped the children or harmed the child. Police officers and relatives of Howard testified that he had a reputation as a liar and a cheat, and that it was always difficult to sort out what was true from what was false about his statements. Investigators in Howard's own capital case said he had made false accusations against another person with great dramatic flair. Both Howard's estranged wife and a nephew of Howard said that Howard told them that one of the investigating officers had either shown him the body or a photograph of the body of the victim, and he said that it looked like hamburger. Howard also told both that he was cooperating with the police in the hopes of a bargain on his own case. Howard's ex-wife said that he had falsely informed police that she had a large quantity of cocaine for sale.[2]

Another witness said that about a week before the kidnapping, she heard Vickie Melander talk about borrowing money from a "Panama." Vickie's mother-in-law testified that Vickie did not appear to love her baby girl. The defense also elicited from prosecution witnesses that Vickie Melander was distraught over her cramped living situation on the day of the murder, was fed up with her unemployed husband, had discovered that she was pregnant again, and had asked an acquaintance whom she hardly knew if she could move in with her after she left her husband.

---

[2] Howard later recanted his trial testimony and said defendant had never made any admissions to him, but had always maintained his innocence. This issue is before us in the petition for writ of habeas corpus, discussed *post*.

Defendant testified that on July 31, 1981, his uncle sent him to pick up a roll of carpet. He had an accident which dented the truck, and fearing his uncle's displeasure, he drove off to visit friends. He ended up in Parker, and spent the afternoon in the Silver Saddle bar, as the prosecution witnesses had testified. It was Vickie Melander who gave him the nickname of Panama Red. He denied ever using the name Don Donovan. He took Vickie Melander to pick up her children, and then they stopped at the Turtle Barn bar so Vickie could talk to a friend. Vickie told him that Michael, Jr., had said that someone had stolen defendant's rifle out of the truck. Defendant said he did not become enraged, and that Vickie had not run away from him toward the sheriff's substation. He said that they drove back to the Silver Saddle, and that he would not agree to go to the substation because he was driving a stolen truck. Defendant flirted with the bartender at the Silver Saddle while Vickie got into an argument with her husband. Vickie then asked defendant to drive her to another bar to talk to friends about finding a place to stay for the night. He could not remember the name of the bar or its exact location. He dropped Vickie and her children off there and then went to PDQ market looking for his gun. He admitted having been upset and telling the store employee that if they had trouble with whoever took the gun, to blow their head off. He then went into a restaurant and talked to a deputy sheriff,[3] who said defendant should report the loss to the police. He then drove off to Texas. He did not clean the pickup truck. He got blood on himself during his arrest in Texas. He did not harm the children and he was not familiar with the area around Parker Dam or with the town of Parker. He did not talk to Tony Krossman about anything except his girlfriend in Oregon, and he followed his attorney's advice and did not talk to anyone in the San Bernardino County jail about his case.

In rebuttal the prosecution put on evidence that there was no bar in Parker in the area where defendant said he had dropped off Vickie and her children.

## II. GUILT PHASE ISSUES

### A. *Sufficiency of the Evidence.*

The court instructed the jury on three theories of first degree murder liability: premeditated, deliberate killing with malice aforethought; murder by means of torture; and killing in the course of a violation of Penal Code section 288, the commission of a lewd act on a child under 14. The jury acquitted defendant of the charge of committing a lewd act on a child, and

---

[3] The court ruled that the deputy could not testify because he had been hypnotized and questioned about defendant. The jury was so instructed.

so we can assume that the jury rejected the felony-murder theory. ■ Defendant argues that there was insufficient evidence to support either of the two remaining theories of liability.

■ When it is alleged that there is insufficient evidence to support the verdict, a reviewing court must review the entire record to determine whether it contains substantial evidence from which a reasonable trier of fact could conclude that the defendant was guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) It is our duty to "view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659]; see also *People* v. *Rich* (1988) 45 Cal.3d 1036, 1081-1082 [248 Cal.Rptr. 510, 755 P.2d 960].)

■ We conclude that there was sufficient evidence of premeditation to support a verdict on that theory. ■ We have found three categories of evidence which are sufficient to sustain a finding of premeditated, deliberate murder: evidence of planning, motive or of an exacting manner of killing. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942]; see also *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1209 [259 Cal.Rptr. 669, 774 P.2d 698].) Evidence in only one of these categories most often is insufficient; we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing. (*Anderson, supra,* 70 Cal.2d at p. 27.)

■ Here, there was considerable evidence of planning. There was evidence that defendant introduced himself under an alias, that he drove off with two children, taking advantage of their mother's temporary absence, that he drove out of town for at least half an hour, that he dropped off the child who was old enough to be able to hinder him in any way or identify him and testify to his acts, that he then drove in the dark along unlighted dirt roads to an abandoned dump, the sign for which was invisible until a vehicle had already made the turn and that he then broke the infant's arm, dashed her head against the rocks and stepped on her. There was evidence that at some point he also sexually abused the body. It can be inferred from the location and poor markings for the dump that petitioner was familiar with it before he abducted the children and planned to use it for its isolation.

Cases indicate that the total vulnerability of the victim and the evidence of a previously selected remote spot for the killing do suggest planning. (Compare, e.g., *People* v. *Hovey* (1988) 44 Cal.3d 543, 556 [244 Cal.Rptr.

21, 749 P.2d 776] [kidnapping of young victim and transportation to secluded spot shows planning]; *People* v. *Frank* (1985) 38 Cal.3d 711, 733 [214 Cal.Rptr. 801, 700 P.2d 415] [kidnapping preselected victim, substantial distance to secluded location and methodical sadism show planning]; *People* v. *Alcala* (1984) 36 Cal.3d 604, 626-627 [205 Cal.Rptr. 775, 685 P.2d 1126] [kidnapping of victim to remote area, taking to very secluded spot and use of deadly weapon show planning].) ■ ■■■■ This, combined with the evidence that defendant selected the more helpless of his victims and abandoned the one who might resist him in any way or testify as to his acts, provides substantial evidence of a planned killing, "the most important prong of the *Anderson* test." (*People* v. *Alcala, supra,* 36 Cal.3d at p. 627.)[4]

■ There is also some evidence of motive. The district attorney argued that defendant was motivated by an incomprehensible need for revenge over the theft of his rifle. Respondent points to evidence of defendant's conduct before the killing which suggested that defendant killed the child in order to have sexual intercourse with her. Although either motivation was totally unreasonable, this is true of any senseless killing, but the incomprehensibility of the motive does not mean that the jury could not reasonably infer that the defendant entertained and acted on it. (*People* v. *Wright* (1985) 39 Cal.3d 576, 593 [217 Cal.Rptr. 212, 703 P.2d 1106].)

As for the final *Anderson* category, the evidence of the manner of the killing, brutality alone cannot show premeditation; a brutal killing is as consistent with a killing in the heat of passion as with a premeditated killing. (*People* v. *Anderson, supra,* 70 Cal.2d at pp. 24-25; see also *People* v. *Alcala, supra,* 36 Cal.3d at p. 626.) However, it must be remembered that the victim was five months old, and so could not walk, or presumably crawl. There can be no question of any struggle, and the fact that there is substantial evidence that defendant took the child from the truck, removed her from her infant carrier and took her in his arms to the place of her destruction, supports an inference that the killing was preconceived. We recognize that a cold and calculating decision to kill can be arrived at very quickly; we do not measure the necessary reflection solely by its duration. (*People* v. *Hernandez* (1988) 47 Cal.3d 315, 350 [253 Cal.Rptr. 199, 763 P.2d 1289]; *People* v. *Wright, supra,* 39 Cal.3d at p. 593; *People* v. *Robertson* (1982) 33 Cal.3d 21, 49-50 [188 Cal.Rptr. 77, 655 P.2d 279]; *People* v. *Thomas* (1945) 25 Cal.2d 880, 900-901 [156 P.2d 7].)

---

[4] We do not require that the planning relate only to the act of killing. In *People* v. *Arcega* (1982) 32 Cal.3d 504, 519 [186 Cal.Rptr. 94, 651 P.2d 338], for example, we said that the unusual circumstance that the defendant had his curtains drawn was evidence of planning under the *Anderson* test. (See also *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1018-1019 [245 Cal.Rptr. 185, 750 P.2d 1342] [luring girls into house and tying wrists of one constituted substantial planning evidence under *Anderson*].)

We are satisfied that the jury could find beyond a reasonable doubt from substantial evidence that defendant committed a deliberate and premeditated murder.

We also conclude that there was sufficient evidence from which a reasonable jury could conclude that defendant killed with the intent to torture.

Torture murder is "murder committed with a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain." (*People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].) There is no requirement that the victim be aware of the pain; what is considered culpable enough to punish the crime as a first degree murder is the calculated intent to cause pain for " 'the purpose of revenge, extortion, persuasion or for any other sadistic purpose.' " (*People* v. *Wiley* (1976) 18 Cal.3d 162, 168 [133 Cal.Rptr. 135, 554 P.2d 881]; see also *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1101 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 267 [221 Cal.Rptr. 794, 710 P.2d 861].) However, there must be a causal relationship between the torturous act and death, as Penal Code section 189 defines the crime as murder "by means of" torture. (*Davenport, supra,* 41 Cal.3d at p. 268.)

While the circumstances surrounding the killing may be used to support the inference that the defendant had the requisite intent, we have cautioned against giving undue weight to the severity of the victim's wounds, as horrible wounds may be as consistent with a killing in the heat of passion, in an "explosion of violence," as with the intent to inflict cruel suffering. (*People* v. *Davenport, supra,* 41 Cal.3d at p. 268, *People* v. *Steger, supra,* 16 Cal.3d at p. 546.)

Defendant maintains that this case falls into the "explosion of violence" category, and that since there was no evidence that the mutilation occurred before death, even the condition of the body did not support an inference of intent to cause cruel suffering. The People, on the other hand, point to the statements of Hicks and Howard to support the inference that at least some of the cutting occurred before the head and rib injuries.

Howard's statement supports the People's position. He said that defendant told him that while driving the truck, he had hit the baby or slapped her around the truck hard enough to break her ribs to stop her from crying, but that she had not stopped crying. He said he tried to orally copulate her, then cut her with his knife, then drove to the dump and threw her out. Howard reported that in one conversation, defendant said that he kept cutting the baby to stop her from crying. This evidence was not inconsistent

with the pathologist's evidence. He said that the rib injuries which would have impaired lung function would not cause death immediately, and that there was nothing to indicate that the rib injuries occurred after the head injury. There was evidence from which a reasonable jury could conclude that defendant had battered and cut the child, while aware of her pain since she was crying, and had then driven to the dump, dashed her headfirst against a rock and stepped on her back. The head injury, which was of a kind that would be caused by impact against a rough surface such as a rock, definitely occurred before death, so the jury could infer that the earlier injuries also came before death. Though the lack of evidence of blood in the truck made it doubtful that much bloodletting had occurred in it, no expert testified that it was impossible or even improbable that there had been some. We think that the evidence was sufficient to allow a jury to conclude that defendant had made incisions on the child while she screamed and that he was aware of her pain but continued to inflict it intentionally over a considerable period. The jury could infer a sadistic intent to give pain to punish her for crying. The evidence gave further ample support for an inference of a sadistic aspect to the infliction of the injuries, given the testimony regarding attempts to orally copulate or otherwise molest the child before death. Further, the incisions were carefully made with a sharp instrument, leaving no jagged edges, and showing no evidence of either hesitation or frantic slashing. There was a nearly scientific air to the incisions. This was strong evidence of a calculated intent to inflict pain rather than a wild explosion of violence.

Finally, even if a jury would necessarily have concluded that the incisions came after death, it could reasonably infer intent to cause cruel and prolonged suffering from the rest of the evidence showing a premeditated and brutal attack on a five-month-old infant. This is not a case like *Steger, supra,* 16 Cal.3d 539, where there was a history of a child abuse syndrome which gave rise to periodic explosions of violence. The jury rejected a theory of voluntary manslaughter in the heat of passion; Michael, Jr., testified to no rage or cursing during the kidnapping. This, along with the long drive out of town to a very isolated spot, the abandonment of Michael, Jr., and the trip to the obscurely located dump, all show a calculation and lack of emotional upheaval that distinguishes this case from those in which we have seen only an explosion of violence rather than an intent to torture.

B. *Diminished Capacity Instruction.*

■ The court instructed the jury that it should consider the defendant's state of intoxication in determining whether specific intent to kill, malice, specific intent to kidnap a child for an illegal purpose and specific intent to commit a lewd act had been proven. (See CALJIC No. 4.21.) Defendant

argues that the court's failure to instruct on diminished capacity (CALJIC Nos. 8.77 and 8.79) sua sponte was reversible error. He argues that as the charged crime was committed in 1981, before the effective date of legislation abolishing the diminished capacity defense,[5] that the court's retroactive application of the abolition of the diminished capacity defense to his case was a violation of the prohibition against ex post facto laws.

The record makes it clear that the trial court thought that the abolition of the diminished capacity defense applied to this case. The court should have realized that since the crimes alleged occurred before the effective date of the statute, the defense of diminished capacity was still available. Nonetheless it did not err in failing to instruct on that defense. The trial court must so instruct only when there is substantial evidence from which a reasonable jury could conclude that there was diminished capacity that negated the requisite criminal intent. (*People* v. *Harris* (1981) 28 Cal.3d 935, 957 [171 Cal.Rptr. 679, 623 P.2d 240].) Normally, merely showing that the defendant had consumed alcohol or used drugs before the offense, without any showing of their effect on him, is not enough to warrant an instruction on diminished capacity. (*People* v. *Carr* (1972) 8 Cal.3d 287, 294-295 [104 Cal.Rptr. 705, 502 P.2d 513]; see also *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1181 [270 Cal.Rptr. 286, 791 P.2d 965]; *People* v. *Turner* (1984) 37 Cal.3d 302, 326 [208 Cal.Rptr. 196, 690 P.2d 669]; *People* v. *Harris, supra,* 28 Cal.3d at p. 958, fn. 8.)

The evidence here was that between 3 or 4 in the afternoon and 8:30 that night, defendant had several beers and a couple of shots of hard liquor. All the witnesses declared that defendant did not seem intoxicated. The only other evidence of intoxication was that Howard testified that defendant told him that when he drove out of Parker with the children, he had been drinking and shooting Quaalude. Howard remembered seeing needle tracks on defendant's arm, but this recollection was impeached by defendant's demonstration that he had no tracks. Defendant testified and did not claim that he had been drunk.

This evidence does not amount to substantial evidence that defendant lacked the capacity to form the requisite mental states, when we compare this case with others in which we have dismissed evidence of diminished capacity as insubstantial. (Compare *People* v. *Ramirez, supra,* 50 Cal.3d at p. 1181; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 762-763 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Turner, supra,* 37 Cal.3d 302, 326-327; *People* v. *Harris, supra,* 28 Cal.3d 935, 958-959; *People* v. *Flannel* (1979) 25 Cal.3d

---

[5] See Statutes 1981, chapter 404, sections 2 and 4, pages 1591-1592. As the bill had no urgency clause, it became effective January 1, 1982. (See *People* v. *Ventura* (1985) 174 Cal.App.3d 784, 789 [220 Cal.Rptr. 269].)

668, 685-686 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 155-156 [158 Cal.Rptr. 281, 599 P.2d 587].) In this case, there was evidence of relatively moderate alcohol consumption, and no evidence from independent witnesses or from defendant's trial testimony that defendant had been intoxicated. Though Howard testified that defendant said he had been drinking and injecting Quaalude, that he did not know what he was doing and that he blacked out during the killing, this was inconsistent with defendant's testimony at trial. Further, there was no expert testimony on the effect of Quaalude. The evidence of diminished capacity was not substantial enough to require instruction.[6]

Defendant argues that the existence of substantial evidence warranting the giving of the instruction is not an issue, because the court's decision to instruct pursuant to CALJIC No. 4.21, on the use of intoxication to show defendant did not actually have the requisite intent, conclusively establishes that there was sufficient evidence to require the giving of the diminished capacity instruction. We specifically rejected this argument in *People* v. *Frierson, supra*, 25 Cal.3d at page 157, saying that the People are entitled to an appellate determination whether the evidence of diminished capacity warranted the jury's consideration.

C. *Intoxication Instructions.*

■ The court instructed the jury that specific intent to kill and malice were necessary elements of murder and that "[i]f the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if the defendant had such a specific intent or mental state." The court told them that if they had a reasonable doubt whether defendant had the requisite intent or mental state, they must give defendant the benefit of the doubt. The court instructed in the same terms that intoxication could be relevant to the intent to kill necessary to establish a manslaughter and to the mental element necessary for the kidnapping counts, that the accused took a child under the age of consent for an illegal purpose or with an illegal intent. Defendant argues that the court erred in failing to instruct on the relationship of intoxication to the intent necessary to prove a torture murder, that is, the intent to inflict cruel suffering.

We agree that a court should instruct a jury in a torture-murder case, when evidence of intoxication warrants it, that intoxication is relevant to the requisite specific intent to inflict cruel suffering. Penal Code section 22

---

[6] Since there was no error, we necessarily reject defendant's claim that the failure to instruct on diminished capacity violated his federal constitutional right to due process of law.

makes evidence of voluntary intoxication relevant on the issue of whether the defendant actually formed any required specific intent. CALJIC No. 4.21 advises courts to instruct on voluntary intoxication as it relates to any required specific intent. Instruction that intoxication is relevant to malice and intent to kill is not enough when a torture-murder theory is involved, as torture murder requires no proof of intent to kill, and the malice element of torture murder can be shown by the doing of an intentional act involving a high probability of death committed with conscious disregard for human life. (*People* v. *Davenport, supra,* 41 Cal.3d 247, 267.) Torture murder involves a unique specific intent which the standard instructions on murder do not cover, so that when intoxication is relevant to the formation of specific intent, the instruction on intoxication should be related to the specific intent involved in torture.

However, as the previous discussion shows, there was not substantial enough evidence of intoxication in this case to require the giving of the instruction, and failure to give the instruction was not a violation of the Eighth and Fourteenth Amendments to the United States Constitution.

D. *Flight Instruction.*

■ Defendant contends that the court erred in instructing pursuant to CALJIC No. 2.52 (4th ed. 1979 bound vol.) that flight after a crime may be considered in determining guilt or innocence, with the weight of the evidence being for the jury to decide. He argues that there was no evidence of flight, that the flight instruction should not be given when the identity of the perpetrator is in issue and that as a matter of due process California must adopt the rule that before the flight instruction may be given, there must be evidence that before he fled, the defendant knew he had been accused.

Penal Code section 1127c requires that whenever evidence of flight is relied on to show guilt, the court must instruct the jury that while flight is not sufficient to establish guilt, it is a fact which, if proved, the jury may consider. This statute was enacted to abolish the common law rule that the jury could not be instructed on flight unless there was evidence defendant knew he had been accused. (*People* v. *Hill* (1967) 67 Cal.2d 105, 120-121 [60 Cal.Rptr. 234, 429 P.2d 586]; *People* v. *Olea* (1971) 15 Cal.App.3d 508, 515-516 [93 Cal.Rptr. 265].) Defendant's argument that we must revive the knowledge requirement as a matter of due process is unpersuasive. He argues that there can be no logical inference of consciousness of guilt unless the accused knows he is accused and flees, and that instructing the jury that they may make totally illogical inferences is a violation of due process.

This is essentially a substantive due process argument. Instruction on an entirely permissive inference is invalid as a matter of due process only if

there is no rational way the jury could draw the permitted inference. (See *Ulster County Court* v. *Allen* (1979) 442 U.S. 140, 157, 165 [60 L.Ed.2d 777, 797, 99 S.Ct. 2213]; *Leary* v. *United States* (1969) 395 U.S. 6, 36 [23 L.Ed.2d 57, 81-82, 89 S.Ct. 1532]; *Tot* v. *United States* (1943) 319 U.S. 463, 467 [87 L.Ed. 1519, 1524, 63 S.Ct. 1241].) Defendant has referred us to federal cases which question the strength of the inference of consciousness of guilt from evidence of flight and which assert that the inference is strengthened when there is evidence that the defendant knew he was accused when he fled.[7] None of these characterizes the inference of consciousness of guilt from evidence of flight as irrational. In fact, the pattern federal instruction on flight[8] requires that the defendant know he has been accused of the crime only if the flight was not immediately after the crime. This instruction or similar instructions are used in many circuits.[9] The instruction at issue here tells the jury that the weight to be given to evidence of flight is for them to decide; the inference is clearly permissive. As there is a rational basis for inferring that if a person flees immediately after a crime to avoid detection, he may do so because he believes himself to be guilty, we conclude that defendant's due process claim is without merit.

Defendant also maintains that there was insufficient evidence of flight to warrant giving the instruction. He argues that the evidence was that he was passing through Parker on his way to Texas, so that the fact that he was discovered in Texas two weeks after the crime was not evidence that he had fled from the scene with any consciousness of guilt. Of course, evidence that the accused left the scene and went home is not evidence of flight that necessarily supports an inference of consciousness of guilt. (See *People* v. *Turner* (1990) 50 Cal.3d 668, 695 [268 Cal.Rptr. 706, 789 P.2d 887]; *People* v. *Green* (1980) 27 Cal.3d 1, 37 [164 Cal.Rptr. 1, 609 P.2d 468].) In this case, however, there was some evidence that defendant thought he had secured a job in Parker and planned to stay there awhile, and that he had flirted with a bartender and would have gone home with her had he been invited. Assuming that the jury could legitimately have decided that he was the perpetrator, they could have inferred that his sudden change of plans showed consciousness of guilt.

[7] See, e.g., *U.S.* v. *Jackson* (7th Cir. 1978) 572 F.2d 636, 641; *U.S.* v. *White* (8th Cir. 1973) 488 F.2d 660, 662; *Embree* v. *U.S.* (9th Cir. 1963) 320 F.2d 666.

[8] See Devitt and Blackmar, Federal Jury Practice and Instructions (4th ed. 1990) section 15.08.

[9] See *U.S.* v. *Touchstone* (6th Cir. 1984) 726 F.2d 1116; *U.S.* v. *Borders* (11th Cir. 1982) 693 F.2d 1318, certiorari denied 461 U.S. 905 [76 L.Ed.2d 807, 103 S.Ct. 1875]; *United States* v. *Harman* (9th Cir. 1980) 632 F.2d 812; *United States* v. *Hernandez-Miranda* (9th Cir. 1979) 601 F.2d 1104; *United States* v. *Myers* (5th Cir. 1977) 550 F.2d 1036, 1048, appeal after remand 572 F.2d 506, certiorari denied 439 U.S. 847 [58 L.Ed.2d 149, 99 S.Ct. 147]; *United States* v. *Stewart* (5th Cir. 1978) 579 F.2d 356, certiorari denied 439 U.S. 936 [58 L.Ed.2d 332, 99 S.Ct. 332].

Defendant also argues that it was error to give the flight instruction under the rule of *People* v. *Anjell* (1979) 100 Cal.App.3d 189 [160 Cal.Rptr. 669], that the instruction should not be given when identity is in issue. We disapproved the broad language of *Anjell* in *People* v. *Mason* (1991) 52 Cal.3d 909, 943, footnote 13 [277 Cal.Rptr. 166, 802 P.2d 950]. We explained: "If there is evidence identifying the person who fled as the defendant, and if such evidence 'is relied upon as tending to show guilt,' then it is proper to instruct on flight." (*Id.*, at p. 943.) Obviously a flight instruction is correctly given "where there is substantial evidence of flight by the defendant apart from his identification as the perpetrator, from which the jury could reasonably infer a consciousness of guilt." (*People* v. *Rhodes* (1989) 209 Cal.App.3d 1471, 1476 [258 Cal.Rptr. 71], italics omitted.) As that is exactly the case here, there was no error in giving the flight instruction.

E. *Malice Instruction.*

 Defendant argues that the court improperly excised the definition of express malice from CALJIC No. 8.11, which defines malice for the jury. The court did give the portion of the instruction which defines implied malice. The omitted language was, "Malice is express when there is manifested an intent unlawfully to kill a human being." Defendant argues that the "inexplicable" failure of the court to give the instruction deprived defendant of the right to have the jury determine every material issue presented by the evidence. He argues that the omission of the definition of express malice made the rest of the instructions confusing and may have suggested to the jury that they could find a first degree murder without finding express malice.

The People argue that any error was invited. We need not reach this point because it is evident from the instructions as a whole that the jury was properly instructed on malice and that the omission defendant complains of could not have prejudiced him. The court told the jury that an essential element of murder is malice aforethought. It told the jury that murder "is the unlawful killing of a human being with malice aforethought." It informed them that malice may be either express or implied, that "[a]ll murder which is perpetrated by any kind of wilful, deliberate and premeditated killing with express malice aforethought is murder of the first degree." And, using language similar to that which defendant complains was omitted from CALJIC No. 8.11, the court instructed that the jury could find first degree murder "[i]f you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was a result of deliberation and premeditation so that it must be formed upon preexisting reflection . . . ." By contrast, the court told the jury that it could

find only second degree murder if it found an unlawful killing "as a direct causal result of an intentional act involving a high degree of probability that it will result in death, which act is done for a base antisocial purpose and with wanton disregard for human life." The court had used exactly these terms to define implied malice. ██ The jury was left with a clear instruction that it could find first degree, premeditated murder only if it found express malice.[10]

### F. *Instruction on Destruction of Evidence.*

██ Defendant argues that the court improperly instructed the jury, over defense objection, regarding attempts to suppress or destroy evidence showing consciousness of guilt. Defendant's argument is that there was no evidence to support the instruction. But the evidence of his offer of $500 to informant Hicks to kill informant Howard, to prevent Howard from testifying against defendant, is clearly evidence of an attempt to suppress evidence, and arguably it was also evidence of an attempt to intimidate a witness. Defendant's argument that this conversation with Hicks about killing Howard was mere jailhouse rhetoric is unpersuasive; the evidence was suggestive enough to allow the jury reasonably to conclude that it showed a consciousness of guilt. "Whether or not any given set of facts may constitute suppression or attempted suppression of evidence from which a trier of fact can infer a consciousness of guilt on the part of a defendant is a question of law. Thus in order for a jury to be instructed that it can infer a consciousness of guilt from suppression of adverse evidence by a defendant, there must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference." (*People* v. *Hannon* (1977) 19 Cal.3d 588, 597 [138 Cal.Rptr. 885, 564 P.2d 1203].) The trial court here did not err in finding that the jury could reasonably infer consciousness of guilt from the request that Hicks kill Howard.

Defendant also argues that the instruction was defective because it failed to tell the jury that it may only draw an inference of consciousness of guilt if every fact necessary to support the inference has been proven beyond a reasonable doubt. However, if we look at the instructions as a whole, the jury was instructed as defendant desires. The court instructed the jury pursuant to CALJIC No. 2.01 on the use of circumstantial evidence, and this instruction states in pertinent part: ". . . before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt." Thus the jury was told

---

[10] The jury was correctly instructed that deliberate intent to kill is not necessary to either the felony-murder or the torture-murder theories.

that before they could use an inference of consciousness of guilt as circumstantial evidence of guilt, they must find any fact upon which the inference rested proved beyond a reasonable doubt.

### G. *Admissibility of Testimony of Informants Hicks and Howard.*

Defendant alleges that the state deliberately made use of Howard as a government agent to elicit incriminating statements from him in violation of his Sixth Amendment right to counsel. The evidence was that sometime between September 4 (when he was arraigned and the public defender appointed) and September 6, 1981, defendant talked about the charged crimes to Howard, who was housed near him in the protective custody unit in the San Bernardino County jail. Howard went to Sergeant Mauldin to say that he needed to talk to someone in homicide investigations, because defendant was talking about the crime. Mauldin arranged for him to talk to Detective Lake. Mauldin did not ask Howard to keep his ears open about defendant, did not tell Howard to come back if he got more information and did not make any offers or promises of benefits to Howard.

On September 6, 1981, Detective Lake talked to Howard about his information. He did not know Howard had been an informant in the past. He had not known that Howard was housed near defendant. He did not recruit Howard to talk to defendant. He never told Howard to keep his eyes and ears open. He did not ask Howard to talk to defendant again. He made no promise of benefit or leniency to Howard. When Howard offered to come back if he got more information, Lake told Howard that Howard was not working for the sheriff's department.

Detective Stalnaker, one of the investigating officers in the case, interviewed Howard on September 13, 14, and 22, after Howard told Mauldin that he had more information. Stalnaker, too, said that he did not know Howard had been an informant in the past. He said he had no control over defendant and Howard's housing, and had made no effort to place them together. He did not tell Howard to keep his ears open or to come back if he heard anything more, nor did he give Howard any incentive to keep informing. Stalnaker made it clear to Howard that Howard was not an agent of the sheriff's department. In these interviews, Howard talked about both his first conversation with defendant, and about later ones, in which defendant described the offenses in great detail.

Detective Lake and a Detective Wilson interviewed Howard again on September 28 and October 2, as Howard had had additional conversations with defendant. Wilson also said that he did not tell Howard to keep his ears open or otherwise solicit Howard's information.

Howard confirmed that he had initiated each interview with the authorities, that they never made him any promises of benefits or leniency, that they made it clear to him that he was not their agent and that they did not ask him to keep his ears open or to come back if he heard anything else.[11] He said that he spoke to the police for his own reasons, not in response to any offer or promise of reward. Howard also denied asking defendant questions and said defendant had volunteered all the information, though ultimately Howard conceded he had asked some questions.

Lake, Stalnaker, and the district attorney in defendant's case testified for Howard in the penalty phase of Howard's capital trial.

The trial court found that the initial contacts were made by Howard, that the sheriff's office did not solicit his help, ask him to question defendant or get information for them, and that the sheriff's office did not make any promises of reward or leniency to Howard. The court further found: "I do find, however, that the Sheriff's Office made it known to Mr. Howard that they were available to discuss whatever he did find or hear about the defendant. [¶] Based upon that thus far—and I further find, really, that within at least one week of the first contact the District Attorney's office knew of what was going on as far as incriminating statements were concerned." The court found further that "he is not a police agent, either expressly or impliedly, that the law enforcement officials did not induce Mr. Howard to seek, elicit, or otherwise obtain information of an incriminating nature from the defendant, Mr. Pensinger." After a recess and reading some of the relevant case law, the court made its final finding: "The Court makes an addition to the findings made yesterday, to reiterate some of the findings and add to them as follows: One, that at no time was the witness Howard solicited by any law enforcement to get information from the defendant, Mr. Pensinger; two, that all statements made by the defendant to the witness Howard were voluntary; three, that the witness Howard was not a police agent, either expressed or implied; fourth, that the witness Howard did not ask for, expect, or receive any benefits from law enforcement, the district attorney's office and/or the judiciary; five, the law enforcement officials did not promise, either expressly or impliedly in any form at any time any benefits to witness Howard in return for testimony."[12]

---

[11] Howard recanted this assertion at the reference hearing on our order to show cause. The effect of this recantation is considered in the discussion of the petition for writ of habeas corpus, *post*, at page 1274 et seq.

[12] Though the motion to exclude filed in the trial court technically referred to all statements defendant made to informants, and thus included statements to Hicks, trial counsel apparently abandoned the claim as to Hicks, putting on no evidence and making no argument regarding Hicks. On appeal, defendant again claims that statements to both Howard and Hicks were taken in violation of his Sixth Amendment rights, but refers us to no facts and makes no

Defendant argues that the trial court erred by overlooking Howard's obvious incentive as a capital defendant to obtain any possible advantage from the police, and his history as an informant. These, he argues, clearly show that Howard had an implied agency relationship with the police, which the police exploited.

It is a denial of the Sixth Amendment right to counsel to admit evidence of an indicted defendant's incriminating statements deliberately elicited from the defendant by a government agent. (*Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]; see also *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183].) "The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State . . . . [K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." (*Maine* v. *Moulton* (1985) 474 U.S. 159, 176 [88 L.Ed.2d 481, 496, 106 S.Ct. 477]; see also *People* v. *Whitt* (1984) 36 Cal.3d 724, 741-742 [205 Cal.Rptr. 810, 685 P.2d 1161].; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1140-1141 [245 Cal.Rptr. 635, 751 P.2d 901] [Sixth Amendment does not prevent the state from using information gathered on the inmate's own initiative].) **(15)** The high court has refined its position, holding in *Kuhlmann* v. *Wilson* (1986) 477 U.S. 436 [91 L.Ed.2d 364, 106 S.Ct. 2616] that there is no Sixth Amendment violation when the cellmate is a passive listening post: "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (*Id.*, at p. 459 [91 L.Ed.2d at pp. 384-385]; see also *People* v. *Hovey, supra,* 44 Cal.3d 543, 560.)

This case was litigated before *Kuhlmann* was decided, so the parties did not focus on whether Howard merely listened to defendant or actually questioned him. But even under *Massiah* and *Henry*, we see no evidence that the government used Howard deliberately to elicit information. The only factors tending to show that Howard was acting for the police as an agent were that they talked to him so many times, and that they and the prosecutor testified in his behalf at the penalty phase of his capital trial. However, the evidence at the hearing was, and the trial court found,

arguments specifically relating to the Hicks statements. Accordingly, the Hicks statements are not discussed.

that no one ever made Howard any promise of benefit or leniency in return for his testimony. It is impossible on this record to conclude that his statements to the police were motivated by any promises of the police or prosecutor. And, though the police interviewed Howard about defendant's statements on six occasions, each interview was at Howard's instigation. The authorities repeatedly told Howard he was not their agent, and to expect no reward. Here, as in *Howard, supra*, 44 Cal.3d 375, 398, and *Whitt, supra*, 36 Cal.3d 724, we have a case in which none of the officers involved in securing Howard's statements knew of Howard's history as an informant and Howard's housing arrangement had nothing to do with any hope of eliciting information from defendant. Unlike in *Whitt*, no officer ever promised Howard any benefit. No one asked him to perform any service. The police simply made use of Howard's own motivation to inform on defendant, a technique we found not to be a knowing subversion of the defendant's right to counsel in *Whitt, supra*, 36 Cal.3d at pages 742-743. ▮ ▮ ▮ ▮ On this record, we must affirm the trial court's ruling that the authorities did not deliberately elicit incriminating statements in violation of defendant's Sixth Amendment right to counsel.[13]

### H. *Prosecutorial Misconduct.*

▮ Defendant argues that the prosecutor improperly appealed to the passion and prejudice of the jury in closing argument when he said: "Suppose instead of being Vickie Melander's kid this had happened to one of your children." Such appeals to the sympathy or passion of the jury are misconduct at the guilt phase of trial. (*People* v. *Fields* (1983) 35 Cal.3d 329, 362-363 [197 Cal.Rptr. 803, 673 P.2d 680].) Defense counsel promptly objected. The court sustained the objection and directed the district attorney to leave the subject. Defendant maintains that the trial court's failure to admonish the jury to disregard the statement prejudiced him. We see no reasonable probability that a result more favorable to defendant would have been reached if the court had admonished the jury. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The prosecutor's comment was an isolated one and it was not repeated. The misconduct did not add cumulative impact to other errors in a crucial area of the case. Moreover, the court said that it was sustaining the defendant's "speaking" objection, and

---

[13] Defendant also asks that we impose a duty on trial courts to instruct the jury sua sponte to view informants' testimony with caution. We adhere to the view that no sua sponte duty should be imposed. (See *People* v. *Carrera* (1989) 49 Cal.3d 291, 314-315 [261 Cal.Rptr. 348, 777 P.2d 121]; *People* v. *Hovey, supra*, 44 Cal.3d 543, 565-566; compare Pen. Code, § 1127a [providing for cautionary instruction on the request of a party].) Since we do not view informants' testimony as inherently unreliable (*People* v. *Alcala, supra,* 36 Cal.3d 604, 624), we reject defendant's argument that the use of such testimony undermines the reliability of the fact-finding process in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

told the prosecutor to go on to another subject. This was a telling indication to the jury that the argument was improper and to be disregarded.

▇▇▇ Defendant also argues that the prosecutor committed misconduct in arguing facts not supported by the record when he argued that the crime was done by someone who was "very violent, a maniac," that "Mr. Pensinger, from the evidence, is just a perverted maniac," and that the three jailhouse informants could be under a "possible death sentence for testifying in this case." ▇▇▇ There was no objection to any of these statements, so the argument cannot be raised for the first time on appeal unless a timely admonition could not have cured the harm. (*People* v. *Green, supra*, 27 Cal.3d 1, 34.) ▇▇▇ Defendant does not argue that an admonition could not have cured the harm and, in any case, there was evidence in the record which, if the jury believed it, would warrant each of the arguments. (Compare *People* v. *Thornton* (1974) 11 Cal.3d 738, 762-763 [114 Cal.Rptr. 467, 523 P.2d 267] [prosecutor may call defendant a sadist when evidence shows brutal sexual attack and intent to inflict pain on victim].) A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury. (*People* v. *Fields, supra*, 35 Cal.3d 329, 362-363; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 580-581 [189 Cal.Rptr. 855, 659 P.2d 1144].) We do not think that the statements defendant objects to here exceeded the bounds of proper argument.

▇▇▇ Defendant finally argues that the prosecutor engaged in misconduct by appealing to the passion of the jury and stating his own personal belief in the guilt of the accused when he said: "I like to win cases and this is a big case . . . there were certain things I wasn't going to do or compromise in order to win cases." Again, there was no objection to this comment.

The context of the remark was that the prosecutor was rebutting the defense argument that he had prepared Michael, Jr., to commit perjury. The prosecutor told the jury that while he always wanted to win cases, he had long ago decided that suborning perjury was not one of the things he was going to do to win. This was a legitimate argument in rebuttal.

I. *Ineffective Assistance of Counsel.*

▇▇▇ On direct appeal, defendant argues that defense counsel was incompetent because he was not aware that the diminished capacity defense was still available to defendant and that this "may well have influenced his choice of defense strategy and tactics, and may have caused less evidence

and less emphasis to be placed on the issue of appellant's mental state at the time of the crime."

A defendant claiming ineffective assistance of trial counsel has the burden of showing that counsel failed to act in a manner to be expected of reasonably competent counsel, that "counsel's representation fell below an objective standard of reasonableness . . . ." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052].) Defendant must also show prejudice, that is, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694 [80 L.Ed.2d at p. 698]; see *People* v. *Ledesma* (1987) 43 Cal.3d 171, 217-218 [233 Cal.Rptr. 404, 729 P.2d 839].) The appellate court must look to the record to determine whether there is any explanation for counsel's acts or omissions. When the record is silent on the reason that counsel acted as he or she did "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal." (*People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

The record does not show the basis for trial counsel's decision not to put on a diminished capacity defense, or whether he investigated or failed to investigate such a defense. Counsel's failure to object to the instruction may have been a result of a misunderstanding of the effective date of the abolition of the defense of diminished capacity, as defendant argues, but it could equally have been the result of a determination that there was no meritorious diminished capacity defense to be made. Whether this evaluation of the diminished capacity defense was a competent decision or not does not appear on the record, and any argument on this point must be raised by way of petition for writ of habeas corpus. (See *People* v. *Pope*, *supra*, 23 Cal.3d at p. 426.)[14]

Defendant also argues that counsel was ineffective when a potential defense witness (Deputy Strom) was excluded under our decision in *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354], because he had been hypnotized, counsel failed to argue that *Shirley* should not apply retroactively. However, we can hardly charge counsel with incompetence for failing to make an argument which we rejected as wrong (see *People* v. *Guerra* (1984) 37 Cal.3d 385 [208 Cal.Rptr. 162, 690 P.2d 635]), and even if counsel should have made the argument, there is no possibility

---

[14] Defendant conceded the point as to the habeas corpus proceeding at the reference hearing on the order to show cause.

of relief, since on retrial, *Guerra* would require the court to again rule that the witness could not testify.[15]

■ Finally, defendant argues that he received ineffective assistance of counsel because counsel failed to object to the use of the alias "Panama Red" on the information and verdict forms. ■ It is generally unnecessary to use an alias in the charging document, and if the indictment uses what are obviously criminal aliases (we gave the example "Slippery Jack") without some good reason, there could be prejudicial error. (*People* v. *Maroney* (1895) 109 Cal. 277, 280-281 [41 P. 1097]; see also *People* v. *Hawley* (1930) 106 Cal.App. 216, 218-219 [289 P. 215] [error in reading string of aliases on indictment harmless]; *United States* v. *Beedle* (3d Cir. 1972) 463 F.2d 721, 725 [alias should not be used in indictment unless necessary to identify accused or protect him from double jeopardy]; but see *United States* v. *Payden* (S.D.N.Y. 1985) 613 F.Supp. 800, 823-824 [if evidence of alias relevant and admissible, alias on indictment will not be stricken].)

■ On the record before us, we cannot say that it was ineffective assistance of counsel to fail to object to the use of the alias Panama Red on the information and the verdict forms. Defendant's use of the alias was a contested issue. Defendant admitted that Vickie Melander introduced him as Panama Red on the day of the offenses, and that he had not objected, but he maintained that he had not used the name before and that it had not been his idea to use it. Several of the witnesses knew him only by that name, including Michael, Jr. Defense counsel argued to the jury that the investigation of the crime had always focussed on "Panama," that the police were

---

[15] In a supplemental brief filed shortly before oral argument, defendant argued in connection with his other ineffective assistance of counsel claims that the exclusion of Strom's testimony under *Shirley* denied him the constitutional right to compulsory process. Trial counsel conceded that *Shirley* required the exclusion of Deputy Strom's testimony, and did not make the due process claim below. Since defendant can point to no authority holding that a rule excluding testimony of witnesses (other than a defendant's) because of pretrial hypnosis violates the right to compulsory process, we can hardly charge trial counsel with incompetence for failing to make the argument. (Compare *Rock* v. *Arkansas* (1987) 483 U.S. 44 [97 L.Ed.2d 37, 107 S.Ct. 2704] [per se rule excluding testimony of hypnotized defendant violates Fifth and Sixth Amendments].) In any case, this argument is based only on speculation as to the value to defendant of the missing testimony. The evidence in connection with the hearing under *Shirley* shows that Strom saw defendant after defendant left Vickie Melander, about the time the kidnapping must have taken place. Though the officer said he saw defendant come into a restaurant at this crucial time, there was no testimony indicating whether or not the officer had an opportunity to look into defendant's truck. Given the penchant of all the participants to leave the children unattended in cars, Strom's testimony would not exonerate defendant unless Strom had an opportunity to look into the truck. Finally, as for the claims that the hypnosis was conducted in bad faith or represented a failure to preserve exculpatory evidence (again a claim that could have been, but was not raised below), the evidence is uncontroverted that the police had a policy of not hypnotizing anyone who was likely to become a witness, and that Deputy Strom was considered unlikely to become a witness.

not interested in following any other leads, though they existed, and that Vickie Melander was responsible for planting the name Panama on defendant and assuring that suspicion would focus on him. Under the circumstances, we can say neither that there could be no competent tactical reason for a decision not to object to the use of the alias on the information and verdict forms, nor that the fact that the jury heard and saw the alias on these documents was prejudicial.

### J. Jury Selection.

■ Defendant asks us to reconsider whether exclusion from the guilt phase jury of persons who would automatically vote against the death penalty results in a jury which is biased and unrepresentative. We rejected this contention in *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], and *People* v. *Fields, supra*, 35 Cal.3d 329, and the United States Supreme Court subsequently rejected it in *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]. There is no need to reconsider the point. (See *People* v. *Thompson* (1990) 50 Cal.3d 134, 157 [266 Cal.Rptr. 309, 785 P.2d 857].)

### III. SPECIAL CIRCUMSTANCES ISSUES

### A. Torture-murder Special Circumstance.

■ The torture-murder special circumstance "requires proof of first degree murder (§ 190.2, subd. (a)), proof the defendant intended to kill and to torture the victim (§ 190.2, subd. (a)(18)), and the infliction of an extremely painful act upon a living victim." (*People* v. *Davenport, supra*, 41 Cal.3d 247, 271.)

The jury was not instructed that the special circumstance required proof of intent to inflict torture. ■ Failure to instruct on an essential element of a special circumstance is not reversible error per se, but is subject to a *Chapman* (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]) harmless error analysis. (*People* v. *Garrison* (1989) 47 Cal.3d 746, 789 [254 Cal.Rptr. 257, 765 P.2d 419].) When there is confusion with respect to instructions on an element, rather than a complete omission, a lower standard of review applies. (See *People* v. *Wade* (1988) 44 Cal.3d 975, 994-995 [244 Cal.Rptr. 905, 750 P.2d 794].) ■ We cannot accept the People's argument that intent to torture was established by the guilt verdict on the first degree murder charge; as the People concede, the first degree murder verdict may have been based on a theory that the murder was premeditated and deliberate, a theory which obviously does not require any proof of intent to torture. We cannot say in this situation that

the jury necessarily resolved the issue of intent to torture against the defendant.

This case is distinguishable from *People v. Wade, supra,* 44 Cal.3d 975, 994, where we said that a jury would not be misled by the omission of the intent-to-torture element of the torture-murder special circumstance. There, it was clear that both the People and the defendant had focussed on the intent to torture, and defendant's capacity to form that intent, as to the murder charge. Defense counsel in *Wade* specifically discussed the question of intent to torture in his arguments to the jury. Here, neither counsel discussed the question, either in the context of the murder charge or the special circumstance allegation.

Nor can we agree with the People that the evidence overwhelmingly established intent to torture. While there was sufficient evidence of intent to torture to sustain a verdict of first degree murder on that theory, the evidence was not overwhelming. The pathologist was not able to say whether the mutilation of the child occurred while she was still alive; the other wounds could have been inflicted in an instantaneous burst of violence. The defendant's statements to jailhouse informants were inconsistent, but there was no explicit expression of an intent to inflict cruel pain. This element of intent was not made an issue either as to the first degree murder charge or the torture-murder special-circumstance allegation; in fact, as noted, neither counsel mentioned it in argument to the jury. On this record we cannot conclude that error in failing to instruct on the element of intent to torture was harmless. We therefore reverse the torture-murder special-circumstance finding.

### B. *Kidnap-murder Special Circumstance.*

Defendant attacks the kidnap-murder special circumstance on four grounds. First, he argues that the court erred in not instructing sua sponte that there could be no kidnap-murder if the kidnapping was merely incidental to the murder, citing *People v. Green, supra,* 27 Cal.3d 1, 61. Defendant's argument that a properly instructed jury could have found that the kidnapping was wholly incidental to the murder of Michelle is totally inconsistent with his first argument that there was insufficient evidence of premeditation and deliberation to support the verdict. His *Green* argument would require the jury to believe that at the time defendant drove off with the children, his purpose was to kill Michelle, and that there was no other independent wrongful purpose involved. While we found sufficient evidence of premeditation and deliberation to support the verdict, we see no substantial evidence that defendant's sole purpose at the inception of the kidnapping was to murder Michelle. Under the circumstances, the *Green* doctrine

cannot be called a general principle of law "closely and openly connected with the facts before the court" giving rise to a sua sponte duty to instruct. (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 60 [222 Cal.Rptr. 127, 711 P.2d 423]; *People* v. *Robertson* (1982) 33 Cal.3d 21, 52 [188 Cal.Rptr. 77, 655 P.2d 279]; *People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].)

Defendant next contends that the kidnap-murder special-circumstance finding must be set aside for the court's error under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], in failing to instruct that intent to kill is a necessary element of the special circumstance. *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] overruled *Carlos* and established that intent to kill need be proved for a felony-murder special circumstance only when the defendant was an aider and abettor and not the actual killer. (*Id*. at pp. 1138-1147.) ██ ██ ██ ██ The *Anderson* rule applies to pre-*Carlos* offenses, such as this one. (*People* v. *Poggi* (1988) 45 Cal.3d 306, 326-327 [246 Cal.Rptr. 886, 753 P.2d 1082].)[16] **(30b)** As all the evidence was that defendant was the actual killer if he was involved at all, the special circumstance finding must be sustained. Further, defendant's intent to kill was established by the jury when it found the torture-murder special circumstance true, as that allegation was that "[t]he murder was intentional and involved the infliction of torture." (Pen. Code, § 190.2, subd. (a)(18).)

Defendant also attacks the kidnap-murder special circumstance on the ground that the jury was not instructed that the allegation requires proof of both a simple and an aggravated kidnapping, proof that defendant alleges Penal Code section 190.2, subdivision (a)(17) requires. We specifically rejected this argument in *People* v. *Bigelow* (1984) 37 Cal.3d 731, 755 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], and it will not be reconsidered here.

Finally, defendant attacks the kidnap-murder special circumstance on the ground that the court failed to instruct on a lesser included offense as to the kidnapping of Michael, Jr., since the court did not tell the jury that only the kidnapping of Michelle could support the kidnap-murder special circumstance, it is urged that the kidnap-murder special-circumstance finding was based on the kidnapping of Michael, Jr., as to which there was the claimed instructional error. We see absolutely no basis for this argument, as a matter of state law or as a matter of federal due process, even assuming that

---

[16] Contrary to defendant's claim, retroactive overruling of *Carlos* v. *Superior Court, supra*, 35 Cal.3d 131, is not an unconstitutional ex post facto expansion of criminal liability. (*People* v. *Poggi, supra*, 45 Cal.3d at pp. 326-327; see also *People* v. *Whitt* (1990) 51 Cal.3d 620, 637 [274 Cal.Rptr. 252, 798 P.2d 849].)

the court should have instructed on a lesser included offense as to the kidnapping of Michael, Jr. The jury convicted defendant of the separate crime of kidnapping of Michelle, and defendant presents no argument that there was any instructional error as to that conviction. It is inconceivable that the jury found defendant murdered Michelle in the course of kidnapping Michael, Jr., but did not conclude that the murder had also occurred during the kidnapping of Michelle.

We conclude, therefore, that we must set aside the torture-murder special-circumstance finding, but that there is no basis for setting aside the kidnap-murder special circumstance.

## IV. PENALTY PHASE

At the penalty phase, the prosecutor presented evidence that in August 1981, defendant was in Midland, Texas, and spent an evening at a bar drinking. He danced with a 10-year-old girl, Angela. In the early morning hours Angela's older sister reported that Angela had been taken out of the bar. Two men followed the truck this girl pointed out, and saw defendant driving it and Angela in the passenger seat. They drove up and yelled at him to stop, and he laughed in a way each man described as "weird" and drove off. They chased him, and finally hit his truck with their car and forced him off the road. Angela jumped out and ran to one of the men, who was a friend of her family, and said that defendant had said that he was "going to make love" to her. Both this man, and her mother who saw her a little later, said that she appeared hysterically frightened. The other man beat defendant severely while defendant laughed. Defendant tried to run away, but both men tackled him and forced him into the back of their car. When he laughed again, one of the men beat him and told him he was a pervert. Defendant started crying and said, yes, that he was a pervert.

Inmate Hicks testified that defendant told him that when defendant went to Texas he had grabbed another little girl and that he was going to take her to a remote area and do the same thing that he had done in Parker, but before he could get away with it he was caught and beaten up by two cops. Defendant said he had gotten out of it because the mother was so happy to get her child back that she did not press charges.

The prosecution also presented evidence that before the charged offenses, in January and February 1981, defendant had lived in Hillsboro, Oregon, with one Molly Dickson and worked with her at a local Kmart store. After he moved in with the young woman, her friend and coworker, Trudy Coerver, also moved in, causing defendant some jealousy. Toward the end of February, Dickson asked defendant to move out. A week or so later her car

was vandalized, the tires stabbed repeatedly with an ice pick and then slashed with a knife. She confronted defendant with this and he said he could not stop it, that "Donovan" was doing it and that he had no control over Donovan. After he went back to California he called her to say that he wanted to pay for the damage to the tires and she said, so you did slash them, and he was silent. He did not use the name Panama and never was violent, nor had he ever threatened her with violence. Trudy Coerver testified that at the end of March or beginning of April 1981, her car was vandalized. Defendant appeared at her workplace, staring at her and cleaning his fingernails with a knife. When she talked to defendant, he said that he had a friend, Donovan, who was after them. He also said that his nickname in California was Panama.

Coerver had a confrontation with defendant toward the end of March in which defendant said that if she and Dickson ever turned their backs he would kill them if he found them alone together. Another coworker, Angela Gordenair, said she talked to defendant, and he said that Donovan was the one who had slashed the tires, that defendant could not stop Donovan and that Donovan was very mean and was going to kill them all. She said that she accused defendant of being Donovan himself, and that "his eyes got weird" and he said that "Donovan used to like you but now you're dead." She also said that he had told her that he had the nickname of Panama.

The defense put on evidence that defendant had lived with his aunt, Penny Meyer, and her 2 daughters in May and June of 1981, and that she had no trouble with him and her 12- and 14-year-old daughters. Defendant had worked with his uncle Thomas Meyer in the carpet laying business. When he accidentally burned one of the girls with his cigarette, he apologized and bought her flowers. They took trips together, including one to Lake Havasu. He displayed no violence or dishonesty until he stole their truck.

Janet Burns, another of defendant's aunts, said that he came to live with her in June or July 1981, and that he presented no problem with her girl, 11, and boy, 8. She never heard him use the names Donovan or Panama, and on the night before he took off in Thomas Meyer's truck, he showed no signs of disturbance.

### V. Penalty Phase Error

#### A. *Oregon Evidence.*

█ Defendant argues that the evidence of his behavior in Oregon was inadmissible because it was irrelevant to any statutory factor in aggravation.

In particular, he claims that the evidence did not qualify as evidence of other criminal activity involving violence under Penal Code section 190.3, factor (b). We disagree.

■■■ Evidence of prior criminal behavior is relevant under Penal Code section 190.3, factor (b) if it shows "conduct that demonstrates the commission of an actual crime, specifically, the violation of a penal statute . . . ." (*People v. Phillips, supra,* 41 Cal.3d 29, 72; see also *People v. Walker* (1988) 47 Cal.3d 605, 639 [253 Cal.Rptr. 863, 765 P.2d 70]; *People v. Belmontes* (1988) 45 Cal.3d 744, 808 [248 Cal.Rptr. 126, 755 P.2d 310].) Further, a threat of violence which is not in itself a violation of a penal statute is not admissible under factor (b). (*People v. Boyd* (1985) 38 Cal. 3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782].) In *Boyd,* we held that evidence of defendant's uncharged crime involving violence to or a threat of violence to property was not admissible as other criminal activity involving violence. (*Id.,* at pp. 776, 777.)

■■■ The People have conceded that defendant's conduct in Oregon would violate no California penal statute. The People maintain, however, that defendant's conduct in Oregon violated an Oregon statute prohibiting "menacing." The crime of "menacing" involves an attempt to put a person in fear of imminent serious physical injury. (Ore. Rev. Stat. § 163.190; *State v. Anderson* (1982) 56 Ore.App. 12 [641 P.2d 40, 41].)[17] The statute was intended to reflect the common law tort of assault, which was defined as intentionally placing another in fear of an immediate battery. (*State v. Garcias* (1984) 296 Ore. 688 [679 P.2d 1354, 1356].) It is distinguishable from the crime of assault in Oregon, since assault requires proof of an act performed with the intent to cause injury. (679 P.2d 1354, 1356.) Menacing, rather, prohibits attempts to evoke fear of assault. (*Id.,* at p. 1359.) " '[M]enacing is intended to cover not only menacing physical acts but also threatening words unaccompanied by a physical movement. The following conduct would be considered menacing: X stands with his right hand in his coat pocket and threatens to shoot Y.' " (*Id.,* at p. 1358, fn. omitted.) A face-to-face confrontation is required. (*Id.,* at p. 1361.) "[T]he concern of the menacing statute appears to center on preventing harm to the victim in the form of tension, alarm and whatever injury may result from the confrontation." (*Id.,* at p. 1358.) Finally, the statute employs an objective standard; what is at issue is not the particular victim's fear, but whether the defendant's conduct would put the reasonable person in a state of fear of imminent serious physical injury. (*State v. Anderson, supra,* 641 P.2d 40, 41; *State v. Lockwood* (1979) 43 Ore.App. 639 [603 P.2d 1231, 1233].)

---

[17] The statute provides in pertinent part: "(1) A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury."

Defendant claims that the element of imminent harm is missing here. Defendant denied vandalizing the cars belonging to Trudy Coerver and Molly Dickson, and claimed that another person, Donovan, had done it. According to defendant, nothing in the tire-slashing incidents could have put a reasonable person in fear of *imminent* physical harm from *defendant*. It is true that the tire slashing, alone, would not amount to menacing, since there was no face-to-face confrontation. Yet, the evidence shows that the day Ms. Coerver's car was vandalized, defendant appeared at the restaurant where the young woman worked, and sat cleaning his fingernails with a butcher knife and staring at her. He had already told Ms. Dickson that his friend Donovan had done the deeds, and that Donovan was "out of control." In the circumstance in which the incidents occurred, that is, (1) the acrimonious breakup of a romantic relationship and defendant's apparent jealousy over Trudy Coerver's friendship with Molly Dickson, (2) the references to Donovan, who was out of control, and (3) the phone calls purportedly from Donovan, this episode in the restaurant could have put a reasonable person in fear of an imminent attack on the person. The threat to kill Dickson and Coerver, if they ever turned their backs and if defendant ever found then alone together, was conditional, but the conditions could easily be met—Ms. Dickson was still nearby when the threat was uttered. Again, in light of defendant's past conduct and relationship with the two women, there would be sufficient evidence to support a guilty verdict for the Oregon crime of menacing. Finally, the last incident, in which Angela Gordenair accused defendant of being Donovan and defendant responded that "Donovan used to like you but now you're dead," clearly shows a threat that a reasonable person could interpret as one involving imminent harm. Though defendant had denied being Donovan, it was clear that Ms. Gordenair had seen through his charade and felt that defendant was Donovan. In this context, a reasonable person could understand the threat as the speaker's own present threat to kill.

Nothing in the language of Penal Code section 190.3, factor (b) suggests that violation of a penal statute of another state, involving violent conduct which would not give rise to a criminal conviction in California, should be inadmissible as a factor in aggravation. The section refers to violation of "a" penal statute, rather than to a violation of "a California" penal statute. It is settled that a prior felony conviction from a foreign jurisdiction is admissible under Penal Code section 190.3, factor (c), even if it would not qualify as a felony under California law. (*People* v. *Lang* (1980) 49 Cal.3d 991, 1038-1039 [264 Cal.Rptr. 386, 782 P.2d 627].) Though we have never considered the point directly, we have assumed that crimes as defined by other jurisdictions are within the ambit of section 190.3, factor (b). In *People* v. *Phillips, supra,* 41 Cal.3d 29, 72, we said, "The only reasonable interpretation is that the statute limits admissibility to evidence that demonstrates the

commission of an actual crime, a requirement easily verified under the definitional guidelines established by legislative bodies in this *and other jurisdictions.*" (Italics added.)

Defendant claims that an interpretation which would admit evidence of conduct which would only be a crime in a foreign jurisdiction would produce a less reliable capital sentencing scheme, since this court is "ill-equipped" to analyze the law of a foreign jurisdiction. This claim ignores the many situations in which state courts are required to interpret and give full faith and credit to foreign judgments. ■■■ Our federal system of comity, and the law of conflict of laws, rests on the sound assumption that the courts of one state are able to interpret and apply the law of sister jurisdictions.

■■■ Defendant also points to Penal Code section 668, which provides for determinate sentence enhancements for foreign convictions only if the conduct was such as could have been punished under the law of California by imprisonment in the state prison. He claims that to allow defendant's conduct in Oregon to be considered in aggravation at the penalty trial is inconsistent with this section. The claim is meritless. Section 668 does not apply outside the realm of determinate sentence enhancements. (*People v. Lang, supra,* 49 Cal.3d at p. 1038.) Even if defendant is arguing by analogy, the comparison is not apt. A factor in aggravation, unlike a sentence enhancement, is simply a circumstance which may or may not affect one or more juror's moral, normative judgment regarding the appropriate penalty. (See *People v. Brown* (1985) 40 Cal.3d 512, 540-544 [220 Cal.Rptr. 637, 709 P.2d 440].) The existence of a factor in aggravation does not "enhance" the sentence; rather, it is considered relevant to a juror's evaluation of the appropriate penalty for one who has already been determined to be death-eligible.

Nor do we accept defendant's argument that use of the Oregon evidence would deny him the due process right to be convicted on sufficient evidence of criminal activity under *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781]. He has not been convicted of the Oregon crime of menacing; in any case the jury was instructed not to consider the evidence of any other crimes mentioned at the penalty trial unless it was convinced beyond a reasonable doubt that the crimes had been committed. We conclude that the evidence of defendant's conduct in Oregon was admissible under Penal Code section 190.3, factor (b).

B. *Jury Selection.*

■■■ Defendant argues that the use of peremptory challenges to systematically exclude persons with reservations about the death penalty, whose

reservations were not strong enough to warrant excusing them for cause, denied him the right to a neutral and impartial jury at the penalty trial. This argument has repeatedly been rejected. (*People* v. *Carrera, supra,* 49 Cal.3d 291, 331; *People* v. *Keenan* (1988) 46 Cal.3d 478, 503 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People* v. *Melton* (1988) 44 Cal.3d 713, 732 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Fields, supra,* 35 Cal.3d 329, 373.)

### C. *Duplicative Charging.*

 Defendant next argues that the penalty verdict should be reversed because the jury erroneously was allowed to consider both the kidnap-murder special circumstance and the torture-murder special circumstance as aggravating factors, despite the fact that these were part of a single indivisible course of conduct under Penal Code section 654. We have repeatedly rejected the argument that section 654 is applicable in this context. (*People* v. *Bean* (1988) 46 Cal.3d 919, 954 [251 Cal.Rptr. 467, 760 P.2d 996]; *People* v. *Melton, supra,* 44 Cal.3d 713, 765-769.)

### D. *Sympathy Instruction.*

 Defendant also argues that the court misinstructed the jury on the role that sympathy for the defendant could play in their penalty determination. In *People* v. *Brown, supra,* 40 Cal.3d 512, 537, vacated *sub nomine California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], we said that an instruction which denies a capital defendant the right to have the jury consider sympathy for the defendant violates federal constitutional requirements of an individualized sentencing process. We disapproved the giving of CALJIC No. 1.00, which tells the jury that it "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." The United States Supreme Court subsequently declared that the giving of CALJIC No. 1.00 is not unconstitutional per se. Rather, the instructions and arguments must be examined as a whole to determine whether the jury was adequately informed of the proper scope of mitigating evidence. (*California* v. *Brown, supra,* 479 U.S. 538, 546 [93 L.Ed.2d 934, 942-943], conc. opn. of O'Connor, J.; *People* v. *Walker, supra,* 47 Cal.3d 605, 641.)

Here, defense counsel proposed a modification of CALJIC No. 1.00, excising the reference to sympathy and the admonition "that you must not be influenced by pity for a defendant or prejudice against him." Over the prosecutor's objection, the court gave defendant's proposed modification: "In this part of the trial, the law does not forbid you from being influenced by pity for the Defendant. However, the law does forbid you from being governed by mere conjecture, prejudice, passion or public opinion."

Defendant now contends that the modified instruction was self-contradictory, and may have confused the jury and left them questioning whether they could consider sympathy for the defendant. Putting aside the question of invited error, we do not agree with defendant's argument that a jury that is told that it is not to be swayed by passion, prejudice or sentiment but is specifically told that it can consider sympathy for the defendant is being instructed in contradictory terms: the latter is simply an express exception to the general rule against reliance on emotional factors.

■ The court did err, however, in instructing the jury pursuant to CALJIC No. 1.00 that it must reach a "just verdict regardless of what the consequences of such verdict may be." A jury at the penalty trial must not be instructed to disregard the consequences of its decision. (*People v. Clark* (1990) 50 Cal.3d 583, 633 [268 Cal.Rptr. 399, 789 P.2d 127]; *People v. Malone* (1988) 47 Cal.3d 1, 43 [252 Cal.Rptr. 525, 762 P.2d 1249].) "It is constitutionally impermissible to instruct a jury in a manner that leads the jury to believe that ultimate responsibility for the determination of the appropriate punishment lies elsewhere. [Citations.]" (*People v. Clark, supra,* 50 Cal.3d 583, 633.) "In this context, an instruction to ignore 'consequences' can be understood by the jury in the same light as an admonition to disregard sympathy." (*People v. Brown, supra,* 40 Cal.3d at p. 537, fn. 7.)

Nonetheless, looking at the instructions and arguments as a whole, we conclude that the jury was not misled. It was specifically informed that it could consider pity for the defendant. Nothing in the argument of either counsel suggested to the jury that it should disregard the consequences of its penalty determination, or that responsibility for that decision lay elsewhere.

E. *Factor (k) and Instructions on Mitigation.*

The court instructed in the terms of Penal Code section 190.3, factor (k), without amplification. In *People v. Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813], we found such an unadorned instruction "potentially confusing." Trial courts "should inform the jury that it may consider as a mitigating factor 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'" (*Id.,* at p. 878, fn. 10, quoting *Lockett v. Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954].) Subsequently, the United States Supreme Court found that unless there is a reasonable likelihood that the jury was otherwise misled, the unadorned instruction in the terms of factor (k) is constitutionally adequate. (*Boyde v. California* (1990) 494 U.S. 370, __ [108 L.Ed.2d 316, 329, 110 S.Ct. 1190].)

██ The instructions and arguments as a whole suggest that instructing in the terms of Penal Code section 190.3, factor (k) did not mislead the jury. (*People* v. *Lucky* (1988) 45 Cal.3d 259, 298 [247 Cal.Rptr. 1, 753 P.2d 1052]; see also *People* v. *Hunter* (1989) 49 Cal.3d 957, 989-990 [264 Cal.Rptr. 367, 782 P.2d 608]; *People* v. *Allison* (1989) 48 Cal.3d 879, 900 [258 Cal.Rptr. 208, 771 P.2d 1294]; *People* v. *Burton* (1989) 48 Cal.3d 843, 866-867 [258 Cal.Rptr. 184, 771 P.2d 1270]; *People* v. *Bonin* (1989) 47 Cal.3d 808, 855 [254 Cal.Rptr. 298, 765 P.2d 460].) The court did instruct the jury that it could consider pity for the defendant, and it instructed the jury to consider all the evidence from both phases of trial in making its penalty determination. It also instructed the jury that it could consider any evidence of possible innocence as a factor in mitigation.

Defense counsel's argument did not turn on character and background evidence in mitigation, since his argument focused on lingering doubt. However, the arguments of counsel did not suggest to the jury that only evidence which mitigated the gravity of the crime could be considered in mitigation. The prosecutor argued that the only factor in mitigation was the defendant's youth, as he was 19 at the time of the crimes. This factor obviously goes beyond mitigation of the gravity of the crime, and admits the relevance of evidence regarding defendant himself.

F. *Weighing Factors.*

██ Defendant also argues that it was error to instruct in the language of Penal Code section 190.3 that "[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." The argument is that such an instruction creates the danger that a juror will simply count up factors and vote for the death penalty because there are more aggravating circumstances, though the juror believes death is not the appropriate penalty. (See *People* v. *Brown, supra,* 40 Cal.3d 512, 542 & fn. 13.)

However, as the People point out, the court did not simply instruct in the statutory language. The court instructed: "You have been instructed as to a number of factors that you may consider. In determining which penalty shall be imposed, you are further instructed that you are not to count the factors in aggravation and compare that with the number of factors in mitigation in determining which of the penalties shall be imposed. [¶] It is not the relative number of factors which shall determine the appropriate penalty, but rather the weight of the factors which shall determine which of the penalties is appropriate. One mitigating circumstance may be sufficient to support a decision that death is not the appropriate punishment in this

case. You may assign to each of the factors the weight, if any, to which you believe it to be entitled."

Nor did the arguments of counsel tend to mislead the jury. The prosecutor did not argue that death was mandatory, or denigrate the jury's role in making a normative decision about the appropriate penalty. There was no error.

### G. *Constitutionality of Penal Code Section 190.3.*

■ Defendant also argues that Penal Code section 190.3 is unconstitutional because it fails adequately to direct and limit the jury's discretion. He argues that the statute must fail because (1) the statute does not specify which of the listed factors are aggravating and which are mitigating, (2) the statute does not require that the jury agree unanimously on the existence of each statutory aggravating factor, (3) the statute does not require the jury to specify in writing the factors upon which it relied, and (4) the statute does not require that the jury determine that aggravating circumstances outweigh mitigating beyond a reasonable doubt.

We have repeatedly rejected such claims, both as to the 1977 and 1978 death penalty laws. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 541 [268 Cal.Rptr. 126, 788 P.2d 640] [1978 law]; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1068 [251 Cal.Rptr. 757, 761 P.2d 680] [same]; *People* v. *Howard, supra,* 44 Cal.3d 375, 444 [same]; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779 [same]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 315-317 [168 Cal.Rptr. 603, 618 P.2d 149] [plur. opn.], 318-319 [conc. opn. of Newman, J.] [1977 law]; *People* v. *Frierson, supra,* 25 Cal.3d 142, 176-180 [plur. opn.] [same].) There is no need to reconsider them here.

### H. *Corpus Delicti and Hearsay Evidence.*

■ Defendant argues that though the jury was instructed at the penalty phase that other-crimes evidence required proof independent of extrajudicial confessions or admissions, there was insufficient corpus delicti to establish any crime in either the Texas or the Oregon incidents. This argument is patently absurd. The prosecutor must establish the corpus delicti of any crime independently of any extrajudicial statements of the defendant, but this requirement only means that the prosecutor must show the fact of an injury, loss, or harm, and the existence of a criminal agency as its cause. (See 1 Witkin, Cal. Criminal Law (2d ed. 1988) § 136, p. 152 and cases cited.) Only a prima facie showing is required, and the corpus delicti may be proved by circumstantial evidence and inferences drawn from circumstantial evidence. (*People* v. *Towler* (1982) 31 Cal.3d 105, 115 [181 Cal.Rptr.

391, 641 P.2d 1253].) The evidence that defendant drove off with an 10-year-old girl at 1 in the morning without asking her mother's permission, that he tried to evade capture for at least half an hour, and that the girl emerged from his truck in hysterics, is ample as to the Texas incident. As for the Oregon incidents, most of the evidence did not come from admissions or confessions. In any case, as for the tire slashing, it is completely reasonable to infer a criminal agency from the fact that the tires were slashed with an ice pick. As for the menacing, the criminal agency was obvious.

 Defendant further argues that the trial court improperly overruled his hearsay objection to evidence relevant to the Texas incident. Steve McKandles testified for the prosecution that he helped to chase defendant after defendant drove off with 10-year-old Angela. McKandles testified over defendant's hearsay objection that when he finally ran defendant off the road, Angela jumped out of the truck and ran to McKandles, obviously frightened. He asked her what the defendant had done or said, and she responded that defendant said that he was going to make love to her. Defendant does not quarrel with the trial court's ruling that Angela's statement was a spontaneous declaration. (See Evid. Code, § 1240.) He argues, however, that the statement was only admissible to show the declarant's, that is, Angela's, state of mind, and that her state of mind was irrelevant; that the admission of the statement without cross-examination of Angela was a violation of the right of confrontation; and that the statement was double hearsay and that there was no hearsay exception for defendant's declaration. These arguments are meritless. Spontaneous declarations are admissible for their truth, not merely for the state of mind of the declarant. Defendant's constitutional argument is totally perfunctory, contained in one sentence alleging that since the jury could not weigh Angela's demeanor and test her credibility, admission of her statement was a violation of the right to confrontation. He cites no authority. Evidence admitted under a traditional hearsay exception does not violate the confrontation clause if there are sufficient indicia of reliability to allow the trier of fact to evaluate the truth of the out-of-court statement. (*Ohio* v. *Roberts* (1980) 448 U.S. 56, 63-66 [65 L.Ed.2d 597, 605-608, 100 S.Ct. 2531]; *Mancusi* v. *Stubbs* (1972) 408 U.S. 204, 213 [33 L.Ed.2d 293, 301-302, 92 S.Ct. 2308].) Statements admitted under the spontaneous declaration exception to the hearsay rule are considered reliable because their spontaneity ensures that the declarant has not had time to reflect and fabricate. (*Box* v. *California Date Growers Assn.* (1976) 57 Cal.App.3d 266, 272 [129 Cal.Rptr. 146].) Several Court of Appeal decisions have rejected the constitutional argument to which defendant alludes. (See *In re Damon H.* (1985) 165 Cal.App.3d 471, 477-479 [211 Cal.Rptr. 623]; *People* v. *Jones* (1984) 155 Cal.App.3d 653, 663 [202 Cal.Rptr. 289]; *People* v. *Orduno* (1978) 80 Cal.App.3d 738, 746-748 [145

Cal.Rptr. 806].) Defendant makes no argument that there was anything about the facts of this case that made the declarant's statement unreliable. Defendant's final argument that the evidence was double hearsay, and that there was no hearsay exception for defendant's out-of-court statement, is equally meritless; his own statement was clearly admissible as the admission of a party. (See Evid. Code, § 1220.)

I. *Limiting Instruction on Other Crimes.*

Defendant also argues that the trial court erred in failing to give a limiting instruction telling the jury what other crimes the prosecutor was relying on as aggravating factors in the penalty phase. He points out that in *People* v. *Robertson, supra,* 33 Cal.3d 21, in conjunction with our holding that the court must give a reasonable doubt instruction on other crimes at the penalty phase (*id.,* at p. 55), we said that "[i]n order to avoid potential confusion over which 'other crimes'—if any—the prosecution is relying on as aggravating circumstances in a given case, the prosecution should request an instruction enumerating the particular other crimes which the jury may consider as aggravating circumstances in determining penalty. The reasonable doubt instruction . . . can then be directly addressed to these designated other crimes, and the jury should be instructed not to consider any additional other crimes in fixing the penalty. Without such a limiting instruction, there is no assurance that the jury will confine its consideration of other crimes to the crimes that the prosecution had in mind, because—as already noted—the jury is instructed at the penalty phase that in arriving at its penalty determination it may generally consider evidence admitted at all phases of the trial proceedings. [Citation.]" (*Id.,* at p. 55, fn. 19; see also *People* v. *Phillips, supra,* 41 Cal.3d at p. 72, fn. 25.)

The jury was given the reasonable doubt instruction as to evidence of other crimes at the penalty phase, but there was no limiting instruction on which other crimes should be considered. We have not imposed any sua sponte duty to instruct in this area. (See *People* v. *Phillips, supra,* 41 Cal.3d 29, 73, fn. 25; *People* v. *Carrera, supra,* 49 Cal.3d 291, 342.) There may even be tactical reasons why the defendant would not wish such an instruction. (*People* v. *Phillips, supra,* 41 Cal.3d at p. 73, fn. 25; see also *People* v. *Easley* (1988) 46 Cal.3d 712, 734 [250 Cal.Rptr. 855, 759 P.2d 490].)

Defendant argues here that the jury may have used evidence from the guilt phase of his solicitation of the murder of Gary Howard, his theft of his uncle's truck, and his statement that he had a gun charge pending, as circumstances in aggravation. Defendant assumes, without demonstrating, that the district attorney could not have persuaded the court to instruct on any of these acts as other criminal activity. The theft of the truck obviously

would not qualify, as it involved no violence, but a "weapons charge pending" and a possible solicitation of murder might have qualified. (See Pen. Code, § 653f, subds. (b) & (d).) Defendant fails to persuade that any instruction would have benefitted him.

### J. *Instruction on Admissions.*

 Defendant maintains that the court's failure to instruct the jury to view his admissions and adoptive admissions with caution was reversible error. (See CALJIC Nos. 2.71 & 2.71.5.) The Attorney General concedes the error but argues that it was harmless.

Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. (See *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1224 [249 Cal.Rptr. 71, 756 P.2d 795]; *People* v. *Beagle* (1972) 6 Cal.3d 441, 456 [99 Cal.Rptr. 313, 492 P.2d 1] [harmless error: one statement heard by two witnesses, one of whom was defendant's friend; other statement heard by police officer; no conflict in evidence]; *People* v. *Ford* (1964) 60 Cal.2d 772, 799-800 [36 Cal.Rptr. 620, 388 P.2d 892] [reversible error: witnesses reporting admission were hostile and inconsistent]; *People* v. *Blankenship* (1970) 7 Cal.App.3d 305, 311-313 [86 Cal.Rptr. 651] [harmless error: witness relating admissions was highly credible and admissions were corroborated]; *People* v. *Hunter* (1969) 1 Cal.App.3d 461, 465 [81 Cal.Rptr. 750] [police officer's testimony relating admissions was reliable and corroborated].)

As defendant points out, there was a considerable amount of important evidence at the penalty trial in the form of admissions and adoptive admissions of the defendant. Inmate Hicks testified that defendant told him that defendant would have done the same thing in Texas as he had in Parker had he not been stopped. Steve McKandles testified that the little girl who had been kidnapped said that defendant said he was going to make love to her. Randy Reed testified that when he accused defendant of being a pervert, defendant said, yes, that he was a pervert. Hicks's statement was crucial, as it was the only evidence that defendant intended to kill the girl he had kidnapped in Texas. Hicks's credibility had been impeached at the guilt phase and his motives for testifying were questionable. However, we do not believe that the jury needed additional guidance in evaluating his testimony. Hicks was a central witness at the guilt phase, and the jury was fully instructed on the caution with which they should approach testimony about defendant's admissions at that stage. When the jury has had to carefully

evaluate the credibility of a central prosecution witness's testimony about the defendant's confession at the guilt phase, it is almost inconceivable that the jury would need help in evaluating that same witness's credibility as to admissions at the penalty phase.

As for the testimony of Steve McKandles that Angela said that defendant said he was going to make love to her, it is true that the jury was not able to evaluate the reliability of the person hearing the admission, as she was not allowed to testify. However, her reliability in reporting defendant's admission is to be considered strong because of the spontaneity of her declaration, and the strong emotion under which she made it. Further, it was not only defendant's admission that connected him to the crime; he clearly took the little girl from the bar in the middle of the night and drove off with her, and had to be pursued and forced off the road before he would give her up. Her statement about his admission was corroborated by these events. Finally, as to Reed's testimony that defendant said he was a pervert, Reed's credibility was not impeached, and the guilt phase evidence as well as the Texas incident itself tended to corroborate the statement.

Defendant also argues that the failure to give the cautionary instructions was prejudicial because of evidence of admissions and adoptive admissions in the Oregon incidents. He points to Molly Dickson's testimony that defendant said that Donovan had slashed her tires; Trudy Coerver's testimony that defendant said if she and Molly Dickson ever turned their backs on him, he would kill them; and Angela Gordenair's testimony that defendant said that Donovan was going to kill them all, and that "Donovan used to like you, but now you're dead." He also points to testimony of adoptive admissions, in that Dickson testified that defendant called her and offered to pay for her slashed tires, and when she accused him of doing the damage he was silent. Further, when Gordenair accused defendant of being Donovan, he did not deny it. However, defendant was unable to impeach the credibility of any of these witnesses. The witnesses corroborated each other as to defendant's use of the name Donovan. The guilt phase evidence that defendant had used the alias in Parker, Arizona, also corroborated their testimony. As for the tire slashing, again Dickson's and Gordenair's testimony was consistent and there was guilt phase evidence from Hicks, admittedly not the most reliable of witnesses, that defendant had told him that he had done some tire slashing in Oregon.

We cannot say that the error in failing to instruct the jury to view admissions and adoptive admissions with caution was substantial or that there is any reasonable possibility that it affected the verdict.

K. *Prosecutorial Misconduct.*

Defendant argues that the prosecutor committed misconduct in the penalty phase by arguing factors in aggravation not included in the statutory list of aggravating factors. He points out that the prosecutor argued defendant's future dangerousness and lack of remorse, and also argued that the death penalty was appropriate because the defendant's crime was "heinous, atrocious, and cruel."

 Defendant's future dangerousness was a central theme of the prosecutor's argument to the jury. Defense counsel did not object, and normally a defendant's failure to object bars the issue on appeal, unless a timely admonition could not have cured the harm. (*People* v. *Green, supra,* 27 Cal.3d 1, 34.) In *People* v. *Davenport, supra,* 41 Cal.3d 247, we indicated that future dangerousness is an appropriate subject for argument, though it would be inappropriate to allow any expert testimony on the subject, since the United States Supreme Court has indicated that open and far-ranging argument is permissible at the penalty phase, and that a state statute requiring the jury to consider future dangerousness as a factor in the penalty determination is also permissible. (See *id.,* at p. 288, citing *Gregg* v. *Georgia* (1976) 428 U.S. 153, 203-204 [49 L.Ed.2d 859, 891-892, 96 S.Ct. 2909], and *Jurek* v. *Texas* (1976) 428 U.S. 262, 275 [49 L.Ed.2d 929, 940-941, 96 S.Ct. 2950]; see also *People* v. *Adcox* (1988) 47 Cal.3d 207, 257 [253 Cal.Rptr. 55, 763 P.2d 906].)

 The district attorney also argued that the jury should consider defendant's lack of remorse in determining the penalty. He used this argument to counter the court's instruction to the jury to consider pity for the defendant in arriving at the penalty determination: " . . . also throughout the course of the trial and all the facts you've heard, apparently Mr. Pensinger to this very minute does not show any remorse or sorrow for what occurred to Michelle or to anybody else that was involved in what he did. And if you are asked to have pity or compassion for Mr. Pensinger, think about how he deals with his victims. Whether now he even feels remorse or sorrow or pity for them . . . [a]nd again, finally, something, when you think about this question of pity where's the remorse, where's the sorrow for what's happened?" Defendant's argument is that this was an unfair penalty for defendant's choice to exercise his right to trial and not to confess. While an argument asking the jury to return a death verdict because the defendant had failed to confess or had maintained his silence would be improper (see *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168 [80 Cal.Rptr. 920, 459 P.2d 248]; *People* v. *Talbot* (1966) 64 Cal.2d 691, 712 [51 Cal.Rptr. 417, 414 P.2d 633]), the argument here did not ask this. The prosecutor is entitled to counter the argument that the jury should spare defendant's life out of pity

for him, and we have said that the jury may consider lack of remorse in fixing penalty. (*People* v. *Walker, supra,* 47 Cal.3d 605, 650; *People* v. *Coleman, supra,* at p. 1168; cf. *People* v. *Key* (1984) 153 Cal.App.3d 888, 900-901 [203 Cal.Rptr. 144].) When comments on lack of remorse do no more than suggest the inapplicability of a potential mitigating factor, they are appropriate. (*People* v. *Walker, supra,* 47 Cal.3d at p. 650.)

 Finally, defendant argues that the prosecutor committed misconduct in arguing to the jury that the death penalty was appropriate in this case because the crime was "heinous and atrocious." Defendant argues that the prosecutor invited the jury to decide the penalty on the basis of a standard we found impermissibly vague as a special circumstance in *People* v. *Superior Court* (*Engert*) (1982) 31 Cal.3d 797, 803 [183 Cal.Rptr. 800, 647 P.2d 76]. If defendant is arguing that the prosecutor's argument must reach the same standard of precision as a penal statute, he is wrong. He also argues that the argument was improper because it was not directed to any of the factors in aggravation enumerated in Penal Code section 190.3. But it was: it called the jury's attention to the circumstances of the charged crime. And again, there was no objection.

### L. *Ineffective Assistance of Counsel.*

Defendant's next argument is that the penalty verdict must be reversed because he received ineffective assistance of counsel at the penalty trial. He points to counsel's failure to object to the acts of prosecutorial misconduct discussed above, but concedes that as there may have been tactical reasons for the failure to object, this argument should be made in a petition for writ of habeas corpus. However, he did not raise the issue of the failure to object in the petition for writ of habeas corpus he filed. He then argues that counsel's argument to the jury at the conclusion of the penalty trial was constitutionally inadequate and requires reversal. This issue is considered fully below, on a more complete record, in the context of the petition for writ of habeas corpus.

### M. *Effect of Invalid Special Circumstance.*

 Defendant contends that the reversal of the torture-murder special-circumstance finding requires reversal of the penalty judgment despite our affirmance of the kidnap-murder special-circumstance finding. We disagree. As we have said before: "The United States Supreme Court has upheld a death penalty judgment despite invalidation of one of several aggravating factors [citation], and this court is in accord." (*People* v. *Sanders* (1990) 51 Cal.3d 471, 520 [273 Cal.Rptr. 537, 797 P.2d 561].) Although instructional error requires reversal of the torture-murder special-circumstance finding,

the evidence of the shocking nature of the attack on the infant victim was properly before the jury. The erroneous special-circumstance finding was only a "statutory label" which could not have affected the verdict in light of the evidence properly before the jury. (See *People* v. *Wade* (1988) 44 Cal.3d 975, 998 [244 Cal.Rptr. 905, 750 P.2d 794].)

## VI. HABEAS CORPUS

Defendant claims that he is entitled to relief on habeas corpus because false material evidence was admitted against him at the guilt phase of trial, because the prosecution failed to disclose material exculpatory evidence, and because he received ineffective assistance of counsel at the guilt and penalty phases of trial. Finding that defendant had stated a prima facie basis for relief,[18] we issued an order to show cause and appointed a referee to determine the factual basis for defendant's claims.[19]

### A. *Failure to Disclose Evidence.*

■ The prosecution must disclose to the defense all substantial material evidence favorable to the accused. (*People* v. *Morris* (1988) 46 Cal.3d 1, 29 [249 Cal.Rptr. 119, 756 P.2d 843]; *People* v. *Phillips, supra,* 41 Cal.3d 29, 46.) Suppression of evidence, even when it is unintentional or inadvertent, violates due process. (*Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 219-220, 83 S.Ct. 1194], *People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341].) The duty to disclose evidence favorable to the accused extends to the disclosure of evidence relating to the credibility of witnesses, including, of course, any inducements made to secure the witnesses' testimony. (*Giglio* v. *United States* (1972) 405 U.S. 150, 154 [31 L.Ed.2d 104, 108-109, 92 S.Ct. 763]; *People* v. *Morris, supra,* 46 Cal.3d at p. 30; *People* v. *Phillips, supra,* 41 Cal.3d at p. 46.) Under the federal Constitution, "the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." (*United States* v. *Bagley* (1985) 473 U.S. 667, 678 [87 L.Ed.2d 481, 491, 105 S.Ct. 3375].)

The referee determined that there was no credible evidence that the prosecution or any law enforcement officer had ever offered inmates Hicks or Howard leniency in return for their testimony and that, thus, there had been no failure to disclose any material evidence on the question of inducements offered to these witnesses. The referee also determined that all "con-

---

[18] See *In re Hochberg* (1970) 2 Cal.3d 870, 873-874 [87 Cal.Rptr. 681, 471 P.2d 1], footnote 2.

[19] We summarily denied defendant's "supplemental" petition for writ of habeas corpus alleging that the prosecution failed to disclose evidence regarding Vickie Melander.

tact which was had with Howard and Hicks was fully disclosed at petitioner's trial."

Defendant objects that the evidence at the hearing showed that the prosecution failed to disclose that just before trial, Howard balked at testifying and demanded that he be given help in child custody proceedings. Defendant also objects that the prosecution failed to prevent Howard from testifying that he had not expected or requested any benefits for his testifying, since he had in fact requested, or rather demanded, help in his child custody proceedings.

The referee's determination of issues of both law and fact is subject to our independent review, but factual findings are entitled to great weight when supported by substantial evidence. (*In re Hall* (1981) 30 Cal.3d 408, 416 [179 Cal.Rptr. 223, 637 P.2d 690].) "This deference derives from the fact that the referee benefits from the opportunity to observe the demeanor of witnesses and to consider their statements in light of their manner on the stand. [Citation.]" (*In re Cordero* (1988) 46 Cal.3d 161, 181 [249 Cal.Rptr. 342, 756 P.2d 1370].)

We agree with the referee that the prosecution fully disclosed its arrangements with Howard and Hicks. At trial it was disclosed that the prosecutor had testified regarding Howard's cooperation at Howard's own capital trial. It was also disclosed that Howard had received a contact visit and some special food which may not have been available to all other inmates. We credit the prosecutor's testimony at the reference hearing that he refused to accede to Howard's request for assistance in his child custody proceedings. We also credit the uncontroverted testimony of the prosecutor that although Hicks's counsel asked that his cooperation be taken into account at his sentencing hearing, the prosecutor did not offer this as an inducement to Hicks, nor did he or the sheriff's department do anything to support Hicks's counsel's request for consideration. In any case, there was no failure to disclose any arrangement with Hicks.

Defendant places great weight on our statement in *People* v. *Phillips, supra,* 41 Cal.3d at page 46, that "[s]ince a witness's credibility depends heavily on his motives for testifying, the prosecution must disclose to the defense and jury any inducements made to a prosecution witness to testify and must also *correct any false or misleading testimony by the witness relating to any inducements.*" (Italics added.) He points out that although Howard apparently tried to strike a last-minute deal to get help in his custody matter in return for his testimony, the prosecutor did not correct his "false or misleading" testimony at trial that he was testifying only because he

abhorred defendant's crime, and that he had never requested any quid pro quo.

We agree with defendant that the prosecution should have corrected the false impression created by this portion of Howard's testimony by disclosing that Howard had unsuccessfully attempted to extort a last-minute advantage in return for his testimony. Nonetheless, since the attempt was unsuccessful and Howard in fact testified without having succeeded in securing a quid pro quo, the portion of his statement explaining his motivation for testifying was not demonstrably false or misleading. His denial that he requested any help from the prosecution, while false, did not mask any inducement. Moreover, defendant fully exploited the strongest evidence of Howard's initial motivation for cooperation with the prosecution, that is, the hope that the prosecutor's testimony at Howard's own penalty trial would cause his jury to reject the death penalty. At trial, the defense was amply able to impeach Howard's claim that he was testifying only because he abhorred defendant's crime. The defense was also able to impeach Howard's credibility generally, with direct evidence of his prior untruthful statements and accusations, and his poor reputation for credibility. In addition, the defense had direct evidence from Howard's ex-wife and nephew that Howard had said he was cooperating with the police in defendant's case in the hope of a bargain in his own case. The prosecutor, in closing argument, conceded that Howard was a liar. Under the circumstances, the limited failure to disclose was harmless (see 2 LaFave & Israel, Criminal Procedure (1984) § 19.5, p. 531 et seq.) and did not undermine the reliability of the proceedings (compare *Pennsylvania* v. *Ritchie* (1987) 480 U.S. 39, 57, 58 [94 L.Ed.2d 40, 58, 107 S.Ct. 989]; *United States* v. *Bagley, supra,* 473 U.S. at p. 678 [87 L.Ed.2d at pp. 491-492]; *Beck* v. *Alabama* (1980) 447 U.S. 625, 638 [65 L.Ed.2d 392, 403, 100 S.Ct. 2382]).

B. *Use of Perjured Testimony.*

A prisoner is entitled to relief by writ of habeas corpus when "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at any hearing or trial relating to his incarceration." (Pen. Code, § 1473, subd. (b)(1).) There is no requirement that the prosecution have known that the evidence was false. (Pen. Code, § 1473, subd. (c); see also *In re Hall, supra,* 30 Cal.3d 408, 424.)

■ Defendant's petition for writ of habeas corpus alleged that he was entitled to relief on these grounds because Howard's testimony that defendant had confessed to him was perjury, because Hicks had caused a knife to be "planted" at the scene and this knife was introduced as the possible murder weapon, and because both Hicks and Howard had perjured them-

selves in denying that they had been offered inducements for their testimony. Howard testified at the reference hearing and recanted his previous testimony inculpating defendant. The referee concluded that no false evidence which was substantially material or probative on the issue of guilt had been introduced against petitioner at trial. The referee did not believe Howard's recantation of his statement to the police, preliminary hearing testimony, and trial testimony. The referee's determination is entitled to special respect when the credibility of witnesses is at stake. (See *In re Hall*, *supra*, 30 Cal.3d at p. 416.)

In view of Howard's substantial consistent testimony at the preliminary hearing and trial, and the referee's conclusion with respect to the credibility of his recantation, we conclude that defendant has failed to demonstrate that Howard's testimony was perjured. Similarly, given the unanimous testimony of numerous police officers and the deputy district attorney who prosecuted defendant, along with the testimony of Hicks, we conclude that there was no perjured testimony with respect to the inducements given Hicks and Howard for their testimony. Finally, as the referee characterized as believable the testimony of Hicks's mother and stepfather denying the accusation that they had "planted" the knife found at the scene and, as this testimony was consistent with Hicks's denial at the reference hearing that he arranged for the knife to be secreted at the scene, we conclude that the knife handle which was introduced against defendant at trial was not "false evidence material on the question of guilt."

Defendant does not take exception to any of the referee's findings on the matters discussed above, but limits his attack to a very narrow argument that testimony at the reference hearing established that Howard committed perjury when he denied that he had asked for anything from the authorities in return for his testimony against defendant. We have already established that the failure to correct this testimony was harmless.

### C. *Ineffective Assistance of Counsel.*

We also issued our order to show cause on the question whether defendant's conviction, or at least the penalty judgment, should be reversed because he received ineffective assistance of counsel. Petitioner alleged that counsel failed to investigate the facts and law relating to a possible diminished capacity defense. Defendant abandoned this claim at the reference hearing, and it will not be discussed here. He also alleged ineffective assistance of counsel because counsel failed to consult a defense forensic pathologist to determine whether the victim had been alive at the time of the mutilation, because counsel failed to consult a defense serologist to examine the knife handle alleged to have been part of the murder weapon and to

advise counsel whether the weather could have eradicated traces of blood from the weapon, and because counsel asked the prosecutor's expert on cross-examination whether the weather could have had this effect, without knowing the answer (which was yes). As to the penalty trial, defendant alleged that counsel was ineffective in failing to investigate and present evidence in mitigation.[20] The referee rejected each claim of ineffective assistance, and we agree.

As on direct appeal, in order to be entitled to a writ of habeas corpus, the defendant has the burden of demonstrating that counsel's performance "fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington, supra,* 466 U.S. 668, 688 [80 L.Ed.2d 674, 693-694].) Although counsel's decisions are entitled to deference to avoid second-guessing his or her tactical choices and to avoid discouraging vigorous advocacy, "deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. '[D]eference is not abdication' [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions." (*People* v. *Ledesma, supra,* 43 Cal.3d 171, 217.)

The defendant must also show that counsel's failure to provide reasonably competent assistance prejudiced him, that is, "absent counsel's errors, there is a reasonable probability of a more favorable outcome. [Citation.] A 'reasonable probability' is not a showing that 'counsel's conduct more likely than not altered the outcome in the case,' but simply 'a probability sufficient to undermine confidence in the outcome' [citation]." (*In re Cordero, supra,* 46 Cal.3d 161, 180, quoting *Strickland* v. *Washington, supra,* 466 U.S. at pp. 693-694 [80 L.Ed.2d at pp. 697-698].)

The referee found that "[d]efense counsel adequately represented defendant in that no prejudice resulted to defendant from the fact that counsel did not consult an independent pathologist on the question whether certain

---

[20] The text of our reference order on the ineffective assistance point was: "Did defendant's trial counsel, Donald N. Feld, inadequately represent defendant (i.e., did counsel fail to act in a manner to be expected of a reasonably competent attorney acting as a diligent advocate) by failing either: [¶] (a) to investigate adequately the law of diminished capacity applicable at the time of trial; [¶] (b) to investigate adequately a possible defense of diminished capacity through available medical records, witnesses, and experts, including investigation of a possible multiple personality disorder; [¶] (c) to consult an independent pathologist on the question whether certain wounds were inflicted before or after death, and whether blood stains on a knife could have been removed by the weather; or [¶] (d) to investigate adequately the available evidence in mitigation for presentation at the penalty phase of trial by, inter alia, interviewing defendant's parents . . . . Did counsel make an informed tactical decision when on cross-examination he asked the prosecution expert, Dr. Speth, whether the weather could have eradicated traces of blood on a knife alleged to have been used in the crime?"

wounds were inflicted before or after death, and whether blood stains on a knife could have been removed by the weather . . . . [¶] Mr. Feld probably did not make an informed tactical decision when on cross-examination he asked the expert, Dr. Speth, whether the weather could have eradicated traces of blood on a knife alleged to have been used in the crime, but neither the question nor the answer prejudiced the defendant."

Upon our independent review of the record, we agree that there was no prejudice. Defendant presented no evidence at the reference hearing that an independent pathologist would or even might have concluded that the wounds were inflicted post mortem. In any event, the prosecution witness was equivocal on the point, and counsel was able to exploit this equivocation in argument to the jury. Defendant now presents evidence that it is probable that traces of blood would have remained on a knife used as the murder weapon even if it was subjected to exposure in the desert, as was the People's exhibit at issue here. We do not think it reasonably probable that a result more favorable to defendant would have occurred had the jury been aware of this evidence. While the prosecution suggested that the knife handle in evidence might have been a part of the murder weapon, they also relied on it to show that defendant had been in the vicinity of the crime scene and to corroborate Hicks's testimony that defendant told him he had left a knife near the scene. It was not essential to the People's case that the jury believe that the knife was the murder weapon; if the jury believed that the knife had belonged to defendant and that he had left it near the scene, the damage was done to defendant's claim that he had never been near the scene.

The referee found that counsel adequately represented defendant in his investigation, preparation and presentation of the penalty phase of the trial. (This finding went beyond our order to show cause and our reference order, which directed the referee to determine whether counsel had inadequately represented defendant by failing to "investigate adequately the available evidence in mitigation for presentation at the penalty phase of trial by, inter alia, interviewing defendant's parents.") The referee recited that counsel had testified that he did interview defendant's parents, other members of his family, and various friends, and that counsel was interested in finding witnesses who saw defendant with young children and who could testify that he was not violent. Counsel in fact called two such witnesses to the stand. The referee also recited that counsel had not called defendant's parents or other witnesses because in counsel's judgment their testimony would not have helped. "It is not true that Mr. Feld did not investigate for witnesses." With regard to any prejudice: "The nature of the evidence that occurred in Oregon, Texas, and then the brutal death of Michelle, the kidnapping of the Melander children, the 'dumping' of five-year-old Michael on the dark road

near Parker Dam, carried into the jury room deliberations. The referee doubts that arguments of counsel or additional witnesses at the penalty phase could have helped petitioner."

The referee's finding is essentially that any failure to investigate could not have prejudiced defendant. The defense experts at the reference hearing were unanimous in their opinion that defense counsel failed to investigate adequately in preparation for the penalty phase of trial, and even the People's expert, Mr. Whitney, thought counsel's investigation barely adequate. Yet the evidence he failed to discover was not of such weight that its discovery would have made defense counsel's penalty phase tactics incompetent, nor was it of such magnitude that its presentation would, with any reasonable probability, have changed the verdict.

While diligent counsel undoubtedly should have delved further into defendant's background rather than simply consulting briefly with parents and a few relatives and friends, further investigation has not turned up any evidence of any great weight. Appellate counsel has not produced any evidence of mental disorder, childhood abuse, or even trauma arising from defendant's parents' divorce. All that has been produced is evidence that on a couple of occasions, defendant acted bravely and selflessly (trial counsel was aware of one of these events), that his wish to join the Army at age seventeen was thwarted (there is no evidence he attempted to join when he reached the age of majority), and that he was once in the Job Corps. Defendant proffers the testimony of his parents and friends, but counsel had interviewed the parents and rejected their testimony—there is no failure to investigate with respect to them. He also talked to other family members and friends. It is evident that defendant's mother would have been subject to impeachment with respect to defendant's juvenile misconduct, and with respect to her relationship with defendant. Kerry Barnowski, George Grambergs, and Robert Barnowski, who testified favorably at the reference hearing about defendant's character, could have been damaging witnesses if the prosecutor had explored their knowledge of defendant's whereabouts and state of mind near the time of the charged offenses. Karl Grambergs was aware of defendant's juvenile misconduct and of an act of violence defendant had committed. None of these witnesses who came forward at the evidentiary hearing were unmitigated blessings for the defense case. It is extremely improbable that if counsel had delved as far as appellate counsel has, he would have changed his mind about his tactics. (Neither counsel asked this question of trial counsel at the hearing, unfortunately.) Nor does it seem at all probable that this essentially cumulative evidence would have changed the jury's view of the appropriate penalty, given the truly atrocious nature of the crimes.

Defendant also argues that counsel's closing argument was incompetent because counsel told the jury that if they had no lingering doubt, perhaps death was the appropriate penalty. This argument is somewhat beyond the reach of our order to show cause, since defendant did not allege, in his petition, an incompetent closing argument as a fact supporting his claim for relief on the basis of ineffective assistance. As a consequence, we did not refer the question of defense counsel's closing argument to the referee. Yet it is dependent to some extent on the claim that counsel failed to investigate enough to make a competent tactical choice about the penalty phase defense, and it is also a claim that defendant did raise in his direct appeal.

Defendant's expert witnesses argued that the "lingering doubt" defense, which counsel chose to rely on in his penalty phase argument, was an incompetent tactical choice. The implication of their testimony was that it is always incompetent to present a lingering doubt defense in isolation at the penalty phase; it is required that counsel also attempt to portray defendant as a human being and, of course, that counsel investigate and present evidence supporting this portrayal. The People's expert, Mr. Whitney, also agreed that it is important in the penalty phase to present the defendant as a human being, and give the jury some reason to spare the defendant's life.

From defense counsel's testimony at the reference hearing, it is clear that counsel made a tactical decision to argue lingering doubt. Since he had staked his all on this theory and while it was extremely risky to tell the jury that if they had no lingering doubt that death might be appropriate, it was not incompetent unless it was incompetent to choose to present that particular defense in isolation. The ultimate question is whether it can ever be competent to choose to present a lingering doubt defense in isolation at the penalty phase. We have said that it is counsel's obligation to " 'portray the defendant as a human being with positive qualities' " and " 'attempt to show that the defendant's capital crimes are humanly understandable in light of his past history and the unique circumstances affecting his formative development, that he is not solely responsible for what he is.' " (*People* v. *Deere* (1985) 41 Cal.3d 353, 366 [222 Cal.Rptr. 13, 710 P.2d 925].) When counsel presents no evidence in mitigation at the penalty phase, we and some federal courts have found ineffective assistance of counsel. (*Id.*, at pp. 365-368; *Blake* v. *Kemp* (11th Cir. 1985) 758 F.2d 523, 533-535, cert. den. 474 U. S. 998 [88 L.Ed.2d 367, 106 S.Ct. 374]; *Dillon* v. *Duckworth* (7th Cir. 1984) 751 F.2d 895, 901, cert. den. 471 U.S. 1108 [85 L.Ed.2d 859, 105 S.Ct. 2344]; *Pickens* v. *Lockhart* (8th Cir. 1983) 714 F.2d 1455, 1465-1468.) Yet here, counsel investigated to some extent, and introduced some evidence of good character, though he used it to bolster his lingering doubt argument. He also had a clear tactical reason for proceeding as he did. Further, the

habeas corpus proceedings have not uncovered any character or background evidence of great significance. This is not a case in which the omitted mitigating evidence could have "totally changed the evidentiary picture" (*Middleton* v. *Dugger* (11th Cir. 1988) 849 F.2d 491, 495) by painting defendant's character in a new light. (Compare *In re Fields* (1990) 51 Cal.3d 1063, 1080 [275 Cal.Rptr. 384, 800 P.2d 862].) Under the circumstances, we cannot say that counsel's tactical choice was incompetent as a matter of law.

A recent case from the Eleventh Circuit reaches the same result: "Counsel simply made the informed decision that the best way to save Julius' life was to argue to the jury that there was still some doubt whether or not Julius committed the crime. Given the brutal nature of the crime, we conclude that such a decision was within the range of professional competence." (*Julius* v. *Johnson* (11th Cir. 1988) 840 F.2d 1533, 1542.) In a similar case, the court said: "In light of this strategy it was reasonable for counsel to elect not to present evidence regarding mitigating factors which imply guilt but which attempt to excuse that culpable conduct. A strategic decision made by counsel after a reasonable investigation into the alternatives deserves deference by the courts . . . ." (*Funchess* v. *Wainwright* (11th Cir. 1985) 772 F.2d 683, 689-690, cert. den. 475 U.S. 1031 [89 L.Ed.2d 349, 106 S.Ct. 1242].) The same court has cautioned that a tactical decision not to present mitigating evidence of which counsel is aware enjoys a strong presumption of correctness. There, counsel chose not to present evidence of the defendant's mental illness because it was inconsistent with counsel's guilt phase argument that defendant was a minor participant who tried to withdraw from the crime. Further, the court cautioned that mitigating evidence can have a negative impact on the jury, so " 'the posture of a given case may well justify, if not require, an effective attorney to refrain from presenting such evidence.' " (*Smith* v. *Dugger* (11th Cir. 1988) 840 F.2d 787, 795; see also *Darden* v. *Wainwright* (1986) 477 U.S. 168, 186 [91 L.Ed.2d 144, 160-161, 106 S.Ct. 2464] [counsel's reliance on plea for mercy was reasonable, since mitigating evidence might have opened door to damaging rebuttal].) Other cases, while conceding counsel's incompetence, find no prejudice, after undertaking to evaluate the probable effect of the missing evidence on the jury. (See *Smith* v. *Armontrout* (W.D.Mo. 1988) 692 F.Supp. 1079; *Bundy* v. *Dugger* (11th Cir. 1988) 850 F.2d 1402, 1412; *Elledge* v. *Dugger* (11th Cir. 1987) 823 F.2d 1439, 1447, cert. den. 485 U.S. 1014 [99 L.Ed.2d 715, 108 S.Ct. 1487]; *Thompson* v. *Wainwright* (11th Cir. 1986) 787 F.2d 1447, 1453, cert. den. *sub nom. Thompson* v. *Dugger*, 481 U.S. 1042 [95 L.Ed.2d 825, 107 S.Ct. 1986].)

On the other hand, some courts find that when little or no evidence in mitigation is presented, the penalty phase fails to function reliably. (*Thomas*

v. *Kemp* (11th Cir. 1986) 796 F.2d 1322, 1325, cert. den. 479 U.S. 996 [93 L.Ed.2d 601, 107 S.Ct. 602].) "It cannot be said that there is no reasonable probability that the results of the sentencing phase of the trial would have been different if mitigating evidence had been presented to the jury. [Citation.] The key aspect of the penalty trial is that the sentence be individualized, focusing on the particularized characteristics of the individual. *Gregg* v. *Georgia* 428 U.S. 153 [citations]. Here the jurors were given no information to aid them in making such an individualized determination." (*Thomas* v. *Kemp, supra*, 796 F.2d at p. 1325; see also *Armstrong* v. *Dugger* (11th Cir. 1987) 833 F.2d 1430, 1433.) Counsel's failure to investigate and introduce available evidence in mitigation has also been found prejudicial, not simply because of an abstract effect on the reliability of the process, but because the court found the omission prejudicial under the particular circumstances of the case. (*Middleton* v. *Dugger, supra*, 849 F.2d 491, 495; see also *Deutscher* v. *Whitley* (9th Cir. 1989) 884 F.2d 1152 [failure to investigate mental defense].)

Although in some cases we have been concerned that a penalty trial in which none of the available mitigating evidence is presented may be unreliable (see *People* v. *Deere, supra*, 41 Cal.3d 353, 364; *People* v. *Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251]), we have rejected the idea that such an omission necessarily makes the process unreliable (*People* v. *Lang, supra*, 49 Cal.3d 991, 1030; *People* v. *Bloom, supra*, 48 Cal.3d 1194, 1228, fn. 9). We have had confidence in the process when, as here, at least *some*, though not all, of the mitigating evidence has been presented. (*People* v. *Guzman* (1988) 45 Cal.3d 915, 960-961 [248 Cal.Rptr. 467, 755 P.2d 917].)

We conclude that the presentation of a lingering doubt argument in isolation at the penalty trial cannot be considered incompetent as a matter of law, nor has defendant demonstrated that it was prejudicial in his case. The People's experts gave it their imprimatur as a reasonable argument after a denial of guilt, especially when, as here, the charged crimes were particularly heinous. Counsel had a tactical reason for failing to present much of the mitigating evidence defendant proffered at the reference hearing, and some mitigating evidence was presented, though counsel used it for the purpose of bolstering his lingering doubt argument. The circumstances of the charged crimes were brutal and shocking in the extreme. While counsel's investigation was barely adequate, it is not reasonably probable that more extensive investigation would have uncovered evidence of such import that he would have been forced, as a competent attorney, to change his tactics. Even if counsel was incompetent in failing to adequately investigate, we conclude that defendant fails to demonstrate prejudice.

The order to show cause is discharged and the petition for writ of habeas corpus is denied. The finding as to the torture-murder special circumstance is reversed. In all other respects we affirm the judgment and the penalty imposed by the superior court.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., and Eagleson, J.,* concurred.

**MOSK, J.**—I concur in the judgment.

I am much disturbed by the fact that the People considered it desirable to call three jailhouse informants to testify against defendant at his trial. Common experience teaches that such persons "may have good reason to lie . . . ." (*United States* v. *Garcia* (5th Cir. 1976) 528 F.2d 580, 588; cf. *On Lee* v. *United States* (1952) 343 U.S. 747, 757 [96 L.Ed. 1270, 1277, 72 S.Ct. 967] [stating that "[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility"].) Recent events reveal that they may also have effective means—sometimes supplied by governmental authorities, sometimes not—to make their falsehoods appear rational and persuasive. (See Rep. of the 1989-1990 L. A. County Grand Jury: Investigation of the Involvement of Jail House Informants in the Criminal Justice System in L. A. County.)

In spite of the foregoing, review of the record convinces me that the majority's disposition is sound. Therefore, I agree with the result.

Appellant's petition for a rehearing was denied April 24, 1991, and the opinion was modified to read as printed above.

---

* Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.